1                   UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                                No. 1:07-cr-10102-MLW-1

4

5

   UNITED STATES OF AMERICA
6

7    vs.

8
     JUAN OCASIO
9

10

11                          *********

12

                          For Hearing Before:
13                     Chief Judge Mark L. Wolf

14

15                       Motion to Suppress

16

17                     United States District Court
                       District of Massachusetts (Boston.)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Friday, June 5, 2009

20

21                          ********

22

                    REPORTER: RICHARD H. ROMANOW, RPR
23                       Official Court Reporter
                       United States District Court
24        One Courthouse Way, Room 5200, Boston, MA 02210
                       bulldog@richromanow.com
25

```
 1                    A P P E A R A N C E S

 2

 3    ROBERT A. FISHER, ESQ.
         United States Attorney's Office
 4       John Joseph Moakley Federal Courthouse
         1 Courthouse Way, Suite 9200
 5       Boston, MA 02210
         (617) 748-3612
 6       Email: Robert.fisher2@usdoj.gov
         For the United States

 7

 8    WILLIAM W. FICK, ESQ.
         Federal Defender's Office
 9       District of Massachusetts
         408 Atlantic Avenue, Suite 328
10       Boston, MA 02110
         (617) 223-8061
11       Email: William_fick@fd.org
         For the defendant

12

13   ALSO PRESENT:

14    PAUL J. GARRITY, ESQ.
         14 Londonderry Road
15       Londonderry, NH 03053
         (603) 434-4106
16       Email: Garritylaw@myfairpoint.net
         For Johan Farias

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                (Begins, 9:45 a.m.)
 3                THE CLERK:  This is Criminal Matter 07-10102,
 4    United States vs. Juan Ocasio, et al.  The Court is in
 5    session.  You may be seated.
 6                THE COURT:  Good morning.  Would those
 7    counsel -- oh, I'm sorry.  We'll administer the oath to
 8    the interpreter.
 9                (THE INTERPRETER, MR. GEOFFRION, sworn.)
10                THE COURT:  Would counsel please identify
11    themselves for the record.
12                MR. FISHER:  Good morning, your Honor.  Robert
13    Fisher on behalf of the United States.
14                MR. FICK:  Good morning, your Honor.  William
15    Fick for Mr. Ocasio.  I'll also note that his wife,
16    Ms. Weakley, and my investigator, Mr. Meadows, are
17    here.  I could ask them to step out if the Court would
18    like them to be sequestered for this as well?
19                THE COURT:  I don't think that's necessary.
20                MR. FICK:  Thank you.
21                MR. GARRITY:  Good morning, your Honor.  Paul
22    Garrity for Johan Farias.
23                THE COURT:  Mr. Fisher, both Acting United
24    States Attorney, Loucks, and Mr. Lang signed, with you,
25    the request for the dismissal of charges against
```

1    Mr. Ocasio.  Do you know where Mr. Loucks is?  I have

2    some questions for him.

3              MR. FISHER:  Your Honor, I can report that he

4    has a family -- I believe a family high school

5    graduation this morning.

6              THE COURT:  And Mr. Lang?

7              MR. FISHER:  My understanding is that Mr. Lang

8    has a previously scheduled contested hearing in front of

9    Judge Young.

10             THE COURT:  Okay.  Well, I'll order now that

11   the government order the transcript of this proceeding.

12   In my order yesterday, I directed the DEA Special Agent,

13   O'Shaughnessy, be present basically reiterating what I

14   ordered on May 27th.  Is he here and outside the

15   courtroom?

16             MR. FISHER:  Your Honor, he is here and he is

17   outside the courtroom.

18             THE COURT:  And I also ordered that if the

19   witness referenced in the statement filed yesterday:

20   "The government is seeking dismissal in part because

21   information it learned of in May, 2009 fatally

22   undermines the credibility of one of its essential

23   witnesses," does not refer to Special Agent

24   O'Shaughnessy, the referenced witness shall also be

25   present if he or she is employed by the government.  Is

 1    the referenced witness Mr. O'Shaughnessy?

 2              MR. FISHER:  Your Honor, that is not a

 3    reference to Special Agent O'Shaughnessy.

 4              THE COURT:  Okay.  And is it somebody employed

 5    by the government?

 6              MR. FISHER:  This person is not employed by

 7    the government.

 8              THE COURT:  Is it the person you were

 9    referring to in the May 27th hearing in the transcript

10    at Page 24?

11              MR. FISHER:  Yes, your Honor.

12              THE COURT:  Okay.  We're going to get to that

13    then.  Thank you.

14         I think, as in many matters, it's useful to try to

15    assure we have a clear and common sense of the

16    background of this.

17         Last week, on May 27th, I held a hearing to learn

18    about this case and to schedule a hearing on

19    Mr. Ocasio's two motions to suppress.  In preparing for

20    that hearing, I didn't realize that there was no

21    government opposition filed to the motion to suppress

22    the identification, so I read the motion to suppress the

23    identification carefully and I became concerned, as I

24    said last week, that Special Agent O'Shaughnessy's DEA 6

25    report concerning the identification, or his first

report, stated that the two cooperating witnesses were
shown a photo array "separately."

Mr. Fisher's much later letter to the Assistant --
well, to Mr. Ocasio's counsel disclosed that
Mr. O'Shaughnessy showed the two cooperating witnesses
two photo arrays simultaneously when they were sitting
next to each other at a table.  The government also,
later, and much belatedly, disclosed that one of the
cooperating witnesses saw Mr. Ocasio in the lockup in
the courthouse before making the identification, a fact
important to the motion to suppress.

As I said, on May 27th, I was and remain concerned
about the integrity of the investigation of this case.
I raised issues of whether misconduct occurred and if so
whether this case could, as a matter of law, and should,
as a matter of fact, be dismissed as an exercise of the
Court's supervisory powers to deal with a persistent
pattern of outrageous misconduct.  The legal issue was
left open by the First Circuit in *Santana,* as I noted in
my May 18th decision in *United States vs. Jones*.

At the May 27th hearing, I also identified various
ways in which the Assistant U.S. Attorney, Mr. Fisher,
had not properly performed his duties to obtain all
material exculpatory information in the possession of
the agencies involved in the investigation.  I expressed

1    the view, that hasn't changed, that Mr. Fisher engaged

2    in a well-meaning effort to discharge his duties.

3    However, Mr. Fisher did not know which agencies,

4    particularly state or local agencies, were involved in

5    the investigation.  Therefore, he did not ask all of

6    them for exculpatory information, as required by the

7    Supreme Court's decision in *Kyles,* by Local Rule 116.8

8    of this court, and as instructed by the U.S. Attorney's

9    Manual, Section 9-5001(v)(2).

10        In addition, the prosecutor did not obtain and

11   review for exculpatory information the notes of the

12   agents and officers involved in the investigation.

13   Local Rule 116.9 requires the preservation of notes for

14   this purpose, among others.

15        In my May 18, 2009 *Jones* decision, which the

16   prosecutor represented that he read, it arose out of the

17   failure to disclose exculpatory information and notes.

18   But the prosecutor did say that there was a DEA report

19   of an interview of a percipient witness being prepared

20   that would have to be turned over as exculpatory

21   evidence.

22        On May 27th, I scheduled a hearing on the motions

23   to suppress for today, June 5.  I ordered the government

24   to produce all material exculpatory evidence by June 1.

25   And I ordered that Mr. O'Shaughnessy attend the hearing

1  today and be prepared to testify.

2      On June 4, yesterday, in the afternoon, the

3  government filed a document captioned "Dismissal of Juan

4  Ocasio From All Counts of the Indictment Pursuant to

5  Rule 48(a)."  In support of the requested dismissal,

6  which the government recognized requires leave of court,

7  the government stated that, quote:  "Both because it

8  agrees that the show-up identification, photo-spread

9  identification and any prospective in-court

10  identification of the defendant by either of the two

11  witnesses referenced in the defendant's motion to

12  suppress should be suppressed and because it learned of,

13  in May of 2009 -- and because information it learned of,

14  in May of 2009, fatally undermines the credibility of

15  one of its essential witnesses, the Government does not

16  believe that it can now prove the charge, the offenses

17  beyond a reasonable doubt.  Accordingly, further

18  prosecution of the defendant in this matter is contrary

19  to the public interest and dismissal of the charges is

20  in the interest of justice."

21      I, upon receiving that submission yesterday

22  afternoon, promptly issued an order.  It says in part

23  that:  "As the government recognizes, Federal Rule of

24  Criminal Procedure 48(a) requires leave of court for a

25  dismissal before trial.  The government has not stated

```
 1   whether the proposed dismissal is intended to be with
 2   prejudice to any future state prosecution nor has the
 3   Court been informed of whether the defendant, Juan
 4   Ocasio, consents to the dismissal on the terms the
 5   Government proposes.  The Court must consider these
 6   issues and also whether the motion is prompted by
 7   considerations clearly contrary to the public interest
 8   in deciding whether to allow the government to dismiss
 9   the charges against Ocasio under Rule 48(a)".  And that
10   statement quoted, in part, the Supreme Court's decision
11   in *Rinali vs. United States*, 434 U.S. 22 at 30, Note 15.
12        Essentially I understand *Rinali* and the related
13   cases to require that I be satisfied that the defendant
14   does not have to be protected from prosecutorial
15   harassment in connection with the dismissal.  I also
16   have to be satisfied that the dismissal will not be
17   clearly contrary to the public interest.
18        The dismissal, in this case, will free a person
19   the government alleges was dealing in large quantities
20   of drugs.  It will put him back on the street.  I have
21   to -- I have a responsibility to assure that the charges
22   are not being dismissed to cover up government
23   misconduct that might be further exposed if a hearing on
24   the motions to suppress proceeds today as scheduled.  So
25   I'd like the government to amplify and explain the
```

1     reasons that the charges should be dismissed.

2              MR. FISHER:  Your Honor, thank you.  And just

3     to clarify the record, you asked me whether the other

4     individual not employed by the government was the one

5     mentioned on Page 24 of the previous transcript from May

6     27th, and he is not that person.  That person mentioned

7     in that page is virtually a person that I, myself,

8     tracked down, out of state, to interview to try to

9     corroborate the information given by the previous

10    cooperator, who is represented in with the co-defendant

11    in this case.

12             THE COURT:  Sorry.  Who is represented?

13             MR. FISHER:  Represented by Attorney Garrity.

14    That person is the person I was trying to corroborate

15    the information of.

16             THE COURT:  All right.  What's that person's

17    name?

18             MR. FISHER:  It's Johan Farias.  Johan Farias.

19             THE COURT:  Johan Farias?

20             MR. FISHER:  The information I was trying to

21    corroborate, in which led to this dismissal, was

22    information I gained in investigating what Mr. Farias

23    informed the government about what Mr. Ocasio had done.

24             THE COURT:  And Mr. Farias was going to be a

25    witness in this case?

1          MR. FISHER:  Correct, at one point.  And just

2     to -- the time line of this case, I think, is

3     important.

4          As the Court knows, I filed my appearance in the

5     case in February of 2008.  When I received the case, and

6     my brother, Attorney Fick, and Attorney Garrity, I'm

7     sure, can address, discovery was essentially complete.

8     I focused on -- when I inherited this case, on the

9     motions that were soon to be scheduled and tried to

10    further investigate the underlying allegations in the

11    case, how we were going to prove it at trial.  And,

12    again, as I said at the previous hearing, that's not an

13    excuse for me not making sure that all notes were in my

14    possession or for speaking to every task force agent,

15    but that's my explanation, that is what happened, or my

16    understanding as to what was there when that discovery

17    was complete.

18          I contacted my brother, Attorney Fick, and

19    Attorney Garrity and tried to make sure that they had

20    some discovery that had been, as my brother termed it,

21    "loose ends," such as disks that couldn't be read, etc.

22    I was told that it may not have been provided.  And I

23    worked vigorously to make sure they got that.  And I'm

24    sure they can communicate that to the Court.  And then I

25    turned my attention towards these motions to suppress,

1    in particular to the two -- the first two cooperators,

2    Jorge and Lorez Santos.  They were indicted in this

3    case.  They were in the car when it was bringing 15

4    kilos across the country back in February of '07.  They

5    fled in Judge O'Toole's session.

6         Shortly after they fled -- they fled to Mexico.

7    Once they fled to Mexico, my -- I realized that they

8    were probably going to be of no use to me at trial

9    because they fled and violated their agreement and

10   because I understood that -- and, you know, I admitted

11   this in the letter that I drafted to my brother, that

12   there was a problem with the photo array, that I was not

13   going to be relying on that at trial.  So therefore my

14   focus turned to how was I to --

15              THE COURT:  And, again, because I'm going to

16   order that Mr. Loucks read this transcript, that letter

17   stated that you wish to "clarify" the DEA 6.  In my view

18   it's not a "clarification," it's a "correction".  That

19   when the DEA 6 says they're interviewed "separately,"

20   it's inconsistent, completely inconsistent, not

21   ambiguous or unclear, but inconsistent, with the

22   assertion -- well, with the fact that they were sitting

23   next to each other and they were doing the photo

24   identification simultaneously.  In fact, it's

25   inconsistent with the directions given to DEA agents

1   that Mr. Fick appended to his motion to suppress.

2       The directions state:  "Where there is more than

3   one witness, each should view the photos," and then in

4   all caps, "SEPARATELY, NOT IN EACH OTHER'S PRESENCE."

5   I'm personally skeptical about whether if a DEA agent

6   was instructed on how to conduct an identification and

7   indeed was using a form that had that on the back, that

8   he could represent, candidly, honestly, that the

9   identifications were separate when he obviously knew

10  that the two cooperating witnesses were in each other's

11  presence.  To me, you "corrected" the record, you didn't

12  "clarify" it.  I said that last week and I reiterate it.

13          MR. FISHER:  Your Honor, and just to be clear,

14  however, I did want to alert my brother to that.

15          THE COURT:  And you did.  You did and that was

16  your duty.  I'm not going to say it's commendable.  Just

17  as we expect people who are let out on pretrial to obey

18  the conditions of their pretrial release, there's a

19  reasonable expectation that prosecutors will know and

20  discharge their duties to disclose material exculpatory

21  evidence.  So you had a duty to disclose it and you did

22  it.

23          MR. FISHER:  So after the first two

24  cooperators fled and I realized there would possibly be

25  problems with the identification, I then -- the first

1    order of business after I took control of the case was

2    the motion to suppress.

3        Once my brother filed his motion to suppress the

4    photo array, of the tainted photo array and application,

5    I reviewed that and I realized that in there there was a

6    paragraph in which he mentioned the possibility that his

7    client was seen by at least one of the cooperators,

8    maybe both, in the lockup.  So I then tried to -- I then

9    turned my attention to investigating that and getting to

10   the bottom of that.

11       Now, again, that occurred before I was even with

12   the office and well before I inherited the case.  And I

13   did get to the bottom of that.  And I discovered a

14   report, and upon which I discovered it, I turned it over

15   to my brother immediately and we had discussions about

16   it.

17            THE COURT:  That report, I think, wasn't

18   marked at the last hearing and it should be made part of

19   the record today.  That's a report that was created 8

20   months after the event in the lockup, right?

21            MR. FISHER:  My understanding, your Honor, the

22   event in the lockup occurred on February 22nd of '07.

23   The date of the report, which I eventually turned over

24   to my brother, was a date in late October of '07.  So,

25   yeah, approximately 8 months.  Yeah, that's correct.

1           THE COURT:  And you turned it over 10 months
2   later?
3           MR. FISHER:  Well, I filed my appearance --
4   correct.  I filed my appearance in February and we -- we
5   had many discussions about what other discovery he was
6   still owed.  I provided that to him.  He filed a
7   motion.  I read that motion and I said, "What is this
8   issue?"  That was the first time I realized that that
9   had been an issue and I remedied it.
10          THE COURT:  And I asked you last week, and
11  perhaps you know more now, but I asked you whether DEA
12  agents have an obligation to promptly prepare, perhaps
13  within a specified time period, DEA 6 reports regarding
14  material events and information.
15          MR. FISHER:  My understanding is that there is
16  no strict policy saying that it has to be done within 7
17  or 10 days or whatever, but if there's a significant
18  event, that it should be memorialized in a DEA 6.  But
19  there's no actual time frame.
20          THE COURT:  Have you looked at the manual?
21          MR. FISHER:  I have not myself looked at the
22  manual.
23          THE COURT:  All right.  Good.  I'm directing
24  you to look at the manual and report to me on Tuesday
25  what it provides on this point, and if it's not a

1   confidential document, to provide the excerpt of it.

2          MR. FISHER:  So once I dealt with that, then I

3   moved on to the stage of --

4          THE COURT:  Have you asked Mr. O'Shaughnessy

5   why he didn't include that information in the earlier

6   DEA 6 concerning the identification and why he prepared

7   the report in October?

8          MR. FISHER:  Well, when this issue arose, I

9   asked him if there was a report, and this was right

10  after the motion was filed, and I'm saying June or

11  possibly -- I believe it was late June of '08.  I mean,

12  I asked him if there was a report reflecting this?  And

13  he said he believed there was.  And I believe the next

14  day, or within one or two days, I then received an

15  e-mail copy of that report, which I provided to my

16  brother.

17      I admit -- I cannot tell you what -- why it took

18  six months.  I wasn't in the office for a large portion

19  of that time.  It wasn't my case up to when it -- I

20  wasn't living it.

21          THE COURT:  Where did you come to this office

22  from?

23          MR. FISHER:  I worked at the Attorney

24  General's Office in Massachusetts prior to coming here.

25      What I did do, after that motion was filed, was

1    respond to them, and then the next issue at hand was how

2    am I going to prove this case?

3           As the Court knows, the person I mentioned

4    earlier, who was represented by Mr. Garrity, did sign an

5    agreement, a cooperation agreement, and gave hours of

6    proffer statements, and in which created pages upon

7    pages of reports.  I provided all of those to my

8    brother, Attorney Fick.

9           Because there was so much information provided by

10   this individual, which was very helpful to this

11   defendant, Mr. Ocasio, because -- and essentially if

12   Farias was going to testify at the trial, I was not

13   going to need the other two cooperators because he can

14   obviously identify --

15           THE COURT:  Well, let me ask you a question.

16   Have the Santoses -- I think you told me they fled to

17   Mexico?

18           MR. FISHER:  They did, your Honor.

19           THE COURT:  Have they been apprehended?

20           MR. FISHER:  They were.  They turned

21   themselves back in at the border.  I believe Jorge, the

22   husband, came in -- he came back and -- he turned

23   himself in back at the border, I believe, about three

24   weeks after he fled.  His wife was gone a bit longer, I

25   want to say an additional three or four weeks.  She

1    eventually turned herself back in, also.  They're now in

2    custody.  They pled.  But there are obvious problems

3    with potentially putting them on the stand.

4         So what I did was try to corroborate the

5    information that the other cooperator gave us as to who

6    Mr. Ocasio had either sold cocaine to, spoken to, who he

7    dealt with as part of a conspiracy for which we

8    charged.  In doing that, I put in many hours trying to

9    track down two witnesses.  One is in custody, is already

10   in Federal custody, however, not in Massachusetts, and

11   in May, myself, along with Agent O'Shaughnessy and a

12   Spanish-speaking agent, when interviewing this

13   individual -- a very lengthy interview, a 2 1/2 hour

14   interview, much longer than I anticipated it to be,

15   because I had a very specific event I wanted to speak

16   about, that individual was not able to identify

17   Mr. Ocasio and, in fact, gave me, and the Office more

18   information about Mr. Farias.  He was able to identify

19   Mr. Farias and confirm that he was dealing large

20   quantities of cocaine, but was not able to identify

21   Mr. Ocasio.  So I realized that to be a major problem.

22   But I knew that, going to that interview, I was going to

23   either learn that Mr. Ocasio was very heavily involved

24   or this person wasn't able to identify him and I learned

25   the latter.

1          Realizing that, it became imperative for me to

2    track down another person whose name was provided during

3    the proffers with the co-defendants.  That person was

4    very difficult to track down.  I was able to track him

5    down and interview him within the past two weeks.  That

6    was someone who, if we were able to get a statement from

7    him, they would be able to corroborate what Mr. Ocasio's

8    role was in this conspiracy in terms of one very

9    specific event.  I interviewed that person with Special

10   Agent O'Shaughnessy within, I believe, the past two

11   weeks and that person did give information which

12   corroborated Mr. Ocasio's involvement in the conspiracy,

13   however, in a different role than what Farias had

14   informed us of.  I realized that was another issue with

15   Farias's potential testimony.

16        My focus then turned on, well, that last person I

17   spoke to -- I won't call them a "cooperator" at this

18   stage, but someone -- a source of information.

19             THE COURT:  And is that the person you were

20   referring to on -- last week?

21             MR. FISHER:  Well, the first one -- correct.

22   There were two sources of information, one was in

23   Federal custody out of state, who spoke to them.  They

24   seemed to -- they were not able to corroborate the

25   information that the cooperator had given.  Then the

1    second source of information was the one I most recently

2    spoke to.  They were able to corroborate it, but in a

3    different set-up than what the cooperator told us.  So

4    this led me to believe that he wasn't being entirely

5    truthful.

6              THE COURT:  On Page 24 of the transcript,

7    you've told me that you and Agent O'Shaughnessy, last

8    Thursday, interviewed somebody who was a percipient

9    witness to information you got through another

10   cooperator and you interviewed that person and tried to

11   corroborate a version of the offense.

12             MR. FISHER:  Correct.

13             THE COURT:  And that report has not yet been

14   finalized.  "So something like that I still need to turn

15   over to my brother.  It just happened last week."

16        Is this the source of information that you're

17   referring to?

18             MR. FISHER:  That's the source of the

19   information.

20             THE COURT:  All right.

21             MR. FISHER:  Who -- um, I determined it was

22   most likely reliable because the information was so

23   specific and we were able then to corroborate some of

24   that, but this road was never ending and it wasn't

25   necessarily making my case any stronger.  And, of

 1   course, that sort of information had issues of its own,

 2   which we learned of after that interview.

 3        So to say the wheels were sort of coming off the

 4   case in terms of what I was going to prove against

 5   Mr. Ocasio as charged, whether or not I could prove that

 6   he was active in the conspiracy to traffic cocaine and

 7   not necessarily just somebody who happened to be

 8   present, or knew what was going on, and maybe had been

 9   giving bribes.  So that's -- my facts were changing and

10   it was a very fluid situation up until the scheduling

11   conference.  So -- and that's what I'm referring to in

12   the motion to dismiss.

13        I'm setting aside the issue with the arrays

14   because by that point I had essentially moved -- I had

15   moved on.  The co-defendant had become my main witness

16   in the case, someone who could help me satisfy all the

17   elements.

18             THE COURT:  Well, that's a little different

19   than what you told me last week.  Last week you told me

20   that you didn't oppose the motion to suppress because

21   you interpreted -- Mr. Fick and I felt misinterpreted it

22   as being directed only on the pretrial identification

23   and you were still hoping to use the Santoses to make an

24   in-court identification.

25             MR. FISHER:  Correct, and this is what I may

1    have lost -- I may have been on thin ice here and I'll

2    explain why.

3         When the motion was first filed, I understood

4    there was an issue with the array.  I had written a

5    letter, so there was no way I could oppose it, then turn

6    around and say, "Okay, even though the array was

7    botched, I'm then going to try and use it."  And my

8    brother and I, we were clear on that issue.  What arose

9    after the motions were filed was the issue of the report

10   that was drafted in October.  I realized that was a

11   second issue which put me on much thinner ice in terms

12   of trying to salvage an in-court ID.

13        However, before I -- what I hadn't -- I thought I

14   would maybe salvage an in-court identification from the

15   Santoses at trial if I did intend to rely on it at

16   trial.  The only reason I would intend to rely on it is

17   if Mr. Farias was not going to be used at all, which as

18   the days progressed in May, was looking more and more

19   like a possibility.  So therefore I'm thinking, "Well,

20   maybe one of the Santoses would have to get on the

21   stand."

22        I anticipated that if there was a hearing,

23   evidence would be presented which would corroborate that

24   idea and get it further -- build a foundation to that

25   Santos ID because they were able to identify

 1    Mr. Ocasio's home, in Lawrence, well before there was a

 2    lockup ID or a tainted photo spread ID.  In addition,

 3    this defendant himself gave statements to investigators

 4    before the lockup ID and the photo array ID that there

 5    was a very strong possibility that he gave our two

 6    cooperators a ride to the motel.

 7         So I understood that I was probably on thin ice

 8    anyway, but I wasn't just, in bad faith, running it out

 9    there that I was going to try to put them on the stand

10    without any independent basis for that ID.  I still felt

11    there was some potential independent basis for that ID,

12    which, of course, would have to be waived by the Court,

13    to salvage an ID by either Lorez or Jorge Santos, and

14    that was based upon the defendant's own statement and

15    the fact that these two folks from California, who had

16    been to Massachusetts one time in their life, in January

17    of '07, were able to show agents exactly where they

18    dropped off a load of cocaine and it was a house that

19    belonged to Mr. Ocasio.  That's what I was resting that

20    argument on.

21         Granted was the fact that there was a report that

22    had been written 6 months later and that I didn't know

23    that it had not been turned over, because I was aware of

24    the situation, I thought it had been disclosed in

25    discovery prior to when I got the case.  But right when

1    I realized it, I turned it over.  That put me on a

2    weaker footing obviously.

3           That was -- that those were the reasons I'm

4    relying on here for the dismissal.  It's the evidence I

5    gathered in May from two sources of information.

6           THE COURT:  Well, I've got a series of

7    questions.  Mr. Fick -- well, actually, let me ask

8    Mr. Fisher first.

9           The government is dismissing with prejudice,

10   correct?

11           MR. FISHER:  Correct, your Honor.

12           THE COURT:  Seeking dismissal with prejudice.

13   That means that there will be no Federal prosecution

14   relating to the events at issue in this case, right?

15           MR. FISHER:  Correct.

16           THE COURT:  What about potential state

17   prosecutions?  Because this was an investigation --

18   well, have you determined what other law enforcement

19   agencies were involved in the investigation?

20           MR. FISHER:  Your Honor, I have.

21           THE COURT:  What were they?

22           MR. FISHER:  Just to clarify, your Honor.

23   Everybody knows that -- the task force agents that were

24   there were all part of a cross-border initiative.  As

25   the Court knows, local officers from local police

1    departments work to help gather evidence.

2              THE COURT:  But last week you weren't able to

3    --

4              MR. FISHER:  It was Salem --

5              THE COURT:  What's that?

6              MR. FISHER:  It was Salem, New Hampshire where

7    Mr. Fay -- I believe I was right, that he works for

8    Lowell.  So they do work for other agencies.  However --

9    and just to clarify for the record, I did, when I

10   inherited this case, speak to Agent O'Shaughnessy, first

11   thing, and try to determine that those agents had not

12   written reports.  That we had all the reports.  That he

13   had all the notes, if they had any written notes.  I --

14             THE COURT:  Well, two things.

15             MR. FISHER:  The Court's position is that I

16   should have contacted each task force agent.

17             THE COURT:  Well, first of all, it's not my

18   position, it's the Supreme Court's position.  We went

19   over this last week and you understood it last week.

20   Maybe you forgot it.  If something's not -- if it is

21   exculpatory in material, even if it's not written down,

22   the government has an obligation to disclose it.  An

23   obvious question is whether the information about what

24   occurred in the lockup downstairs here wasn't included

25   in the original report, you know, or whether it was left

1   out?

2        The transcript which I've reread -- and I keep

3   having to put other things down to deal with these

4   recurring issues, reminds me what you told me last week,

5   that you didn't know all the agencies involved in the

6   investigation.  And if you don't know all the agencies

7   involved in the investigation, then you can't make the

8   inquiry required under *Kyles,* a Supreme Court case, or

9   under our local rule, which was intended to keep well-

10  meaning prosecutors like you out of trouble and promote

11  fair trials.

12       And have you had any -- when did you come to the

13  U.S. Attorney's Office?

14            MR. FISHER:  Your Honor, I started in June of

15  2007.

16            THE COURT:  All right.  And did you have

17  instruction on *Brady* responsibilities?

18            MR. FISHER:  I did, your Honor.  Correct.

19            THE COURT:  And where were you instructed?

20            MR. FISHER:  I had training here.

21            THE COURT:  Did you go to the Department of

22  Justice training at the National Institute or whatever

23  they call it?

24            MR. FISHER:  Your Honor, I have the -- it's

25  the National Advocacy Center.  I've been there, correct.

1           THE COURT:  All right.  And have you read the

2      --

3           MR. FISHER:  I was a state prosecutor and a

4      Federal prosecutor.

5           THE COURT:  Yeah.  Have you read the pertinent

6      provision of the U.S. Attorney's manual?

7           MR. FISHER:  I have, your Honor.  When I

8      started with the Office, I read the entire manual.

9           THE COURT:  Because it says:  "It is the

10     obligation of Federal prosecutors, in preparing for

11     trial, to seek all exculpatory and impeachment

12     information from all members of the prosecution team.

13     Members of the prosecution team include Federal, state

14     and local law enforcement officers and other government

15     officials participating in the investigation and

16     prosecution of the criminal case against the

17     defendant."  *Kyles*, 514 U.S. at 4347.

18         So it's not my idiosyncratic position that you're

19     supposed to do it, but that you have a constitutional

20     duty to do it, you have a duty to do it under the local

21     rules, and the Attorney General of the United States is

22     telling you to do it.

23           MR. FISHER:  Correct, your Honor, and this is

24     what I did, to clarify the record.

25         The very first time I ever stood up in this case

1    in court was in this building for the scheduling

2    conference on May 27th.  At that time I was still

3    working on -- the evidence in this case was extremely

4    fluid at that time.  I was still trying to report to my

5    brother, which he will attest to.  I was still tracking

6    down witnesses out of state.  I had to come back from

7    Las Vegas.  I had been still investigating the case.

8         My understanding, and I believe I'm correct, was

9    that because all the agents that worked on this case

10   weren't Federal marshals, they were task force agents,

11   they were not submitting reports to their local PDs,

12   whether in Salem, New Hampshire, or the Lowell Police

13   Department, they were working under the case agent's

14   authority, Agent O'Shaughnessy, due to their cross-

15   border initiative, that -- I had this conversation with

16   Special Agent O'Shaughnessy.

17        Of course, if I'd -- my understanding is that I

18   would come to the scheduling conference, we would get a

19   motion to suppress date, any witnesses that I would be

20   calling or relying on in court, of course, I'm going to

21   sit down with every single one of them in detail and

22   then, well before trial, I'm going to do the same exact

23   thing.  That is my practice.  My understanding was that

24   when I inherited -- in this period between discovery

25   being complete and preparing for a motion, I was focused

1   on the potential that I would need Special Agent

2   O'Shaughnessy on the stand for a consent search and

3   maybe another witness.  We were still actively speaking

4   about resolving the case.  I was turning over volumes of

5   information to my brother about what other cooperators

6   were saying.  So that's where my focus was.

7           THE COURT:  Well, if that's your focus -- your

8   focus should have been -- well, a couple of things.

9   First of all, this isn't Mr. Fisher versus Mr. Ocasio,

10  this is the United States of America versus Mr. Ocasio,

11  and some of the defects here occurred before you were

12  even employed by the United States Attorney's Office.

13  Essentially, under the local rules -- were you

14  instructed on the local rules?

15          MR. FISHER:  I was, your Honor, and I

16  frequently refer to them.

17          THE COURT:  Yeah, under the local rules,

18  within 42 days of arraignment, in effect, all material

19  exculpatory evidence has to be disclosed that relates to

20  the admissibility of evidence that's pertinent to a

21  motion to suppress.  And material exculpatory evidence

22  doesn't mean material exculpatory information provided

23  by somebody the government intends to call, that's

24  ***Jencks***, but if there's somebody you don't intend to call

25  who has material exculpatory information, you have a

1    duty to turn that over.

2         MR. FISHER:  Your Honor -- again, let me

3    clarify that.  During the pendency of those 42 days, I

4    was with the Attorney General's Office and --

5         THE COURT:  When I say "you" -- and that's a

6    good point.  When I say "you," I don't mean you,

7    Mr. Fisher, I mean the United States of America, the

8    human beings who work in the Department of Justice who

9    represent the Attorney General of the United States

10   Attorney in court.  The government has that obligation.

11   And, as I said, if your predecessor, in performing the

12   duties you're now performing, had performed them

13   correctly, you wouldn't be in this predicament.  But --

14   and, you know, I want to repeat.  I mean, I can see

15   you've been trying to do this right.  But as you said

16   last week and I think you said again today, there are

17   errors and imperfections that the motion -- the request

18   to dismiss, you know, recognize are very important.

19   This might have gone to an unfair conclusion, which is

20   not what any prosecutor should wish for -- and I don't

21   get the sense it's what you wish for, and it's certainly

22   not what any judge who's trying to assure trials that

23   are fair to the government and to the defense wishes for

24   or can tolerate.

25        MR. FISHER:  Your Honor, and that was one of

1   the reasons, your Honor, I was working -- putting in a

2   lot of hours trying to corroborate everything they could

3   give me towards getting to the bottom of what

4   Mr. Ocasio's role really was in this case.

5           THE COURT:  All right.  But what about the

6   question I asked you, is Mr. Ocasio at risk for being

7   prosecuted by some authority other than the Federal

8   government for the events relating to this case?

9           MR. FISHER:  I approach that two ways.  One,

10  because the state is a separate sovereign, could they

11  potentially charge here for his role in this

12  conspiracy?  Um, I guess they could.  I've never spoken

13  to a state official to get a determination of whether or

14  not they have any interest in the case.

15      Now, I can speak on my experience as a state

16  prosecutor, as I was one before I came here, that

17  Mr. Ocasio, even if he was charged by the state, if I

18  was still with the AG's office and somebody sent this

19  case over and said, "Would you charge him?"  I would

20  have to say "No."  Under the state law, it's a dry

21  conspiracy.  The 15 kilograms were taken off in Kansas.

22  Therefore he never possessed cocaine in this state.

23  Therefore it's a straight conspiracy.  It carries a

24  maximum of 20 years, but no minimum mandatory.  I would

25  be -- if he was ever charged, which is highly unlikely,

1    and convicted, I'd be surprised if he got 90 days on

2    that type of conspiracy and with that type of evidence

3    in the state court.  No.  But, no, I have not confirmed

4    it.

5              THE COURT:  All right.  In some cases there

6    are agreements from prosecutors.  But my interest here

7    is assuring that before I turn to Mr. Fick and

8    Mr. Ocasio, um, that they know what risk, if any, there

9    is.

10         Mr. Fick, does Mr. Ocasio want the charges

11   dismissed with prejudice?

12             MR. FICK:  Yes, your Honor.

13             THE COURT:  And have you discussed that with

14   him?

15             MR. FICK:  Yes, your Honor.

16             THE COURT:  And, Mr. Ocasio, please stand.

17             (Defendant stands.)

18             THE COURT:  Do you understand that the

19   government now wants to -- the Federal government, the

20   United States government now wants to dismiss the

21   charges against you and says that the United States

22   government will not try to prosecute you again for

23   events relating to the charges in this case?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And have you talked with Mr. Fick

1    about whether you want the charges against you, in this

2    case, dismissed?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Are you fully satisfied with his

5    work as your lawyer?

6              THE DEFENDANT:  Yes.

7              THE COURT:  And do you want the charges

8    dismissed?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Do you understand there's a

11   possibility that some state, Massachusetts or New

12   Hampshire, perhaps might conceivably prosecute you?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And do you still want these

15   Federal, United States charges dismissed?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Thank you.  You may be seated.

18             (Defendant seated.)

19             THE COURT:  I have some more questions.

20   Mr. Fick -- not Mr. Fick, excuse me, Mr. Fisher.

21        Mr. Fisher, in my May 27th order, I directed you

22   to, in effect -- well, on May 27th, I essentially

23   directed you to get and review all the notes from all

24   the participating agencies and disclose all exculpatory

25   information by June 1.  Did you do both of those

 1  things?

 2          MR. FISHER:  I did that, your Honor.

 3          THE COURT:  And is there any investigation

 4  being conducted to determine whether Mr. O'Shaughnessy

 5  should be disciplined or possibly prosecuted under 18

 6  United States Code, Section 1001, for the filing of the

 7  -- the preparation, presentation to the U.S. Attorney of

 8  the DEA 6 that stated that two cooperating witnesses had

 9  conducted the investigation -- had conducted the

10  identification separately?

11          MR. FISHER:  Your Honor, my understanding, and

12  I can confirm that his supervisor is well aware of the

13  situation.

14          THE COURT:  That doesn't -- they're well aware

15  of it.  So what are they doing about it?

16          MR. FISHER:  I'm not privy to the internal

17  dialogue of the supervisor of the DEA.  All I can

18  represent to the Court is that that's my personal

19  understanding, that they do know of the situation.

20          THE COURT:  Well, this goes right to the point

21  in *Rinali*.  I fully understand that it's 100 percent up

22  to the government whether to bring charges and it's

23  substantially, but not exclusively, up to the government

24  whether to dismiss charges, but there are only limited

25  circumstances on which I properly could or would decline

1    to dismiss, but one of them is if "the motion is

2    prompted by considerations clearly contrary to the

3    public interest," the Supreme Court says.  And I am

4    concerned that if I dismiss this case, nothing will

5    occur in court that creates a record of the

6    circumstances under which that DEA 6 was prepared and

7    with regard to what might be -- and I'm not saying it

8    is.  I'm very cautious about coming to conclusions that

9    law enforcement agents or prosecutors have engaged in

10   misconduct, but it's happened and I found that it's

11   happened.

12        As I told you last week, as far as I'm concerned,

13   this isn't the National Basketball Association where

14   it's sometimes said "no harm, no foul."  You know, the

15   fact that an inaccurate, and possibly deliberately

16   inaccurate DEA 6 report was prepared here, raises a

17   question of whether it was intentional, and if it's

18   intentional, whether it's part of a practice?  And I

19   don't know how you or Mr. Loucks propose to address that

20   concern.

21             MR. FISHER:  Your Honor, with all due respect

22   to the Court, Mr. Loucks, as I said before, couldn't be

23   here today.

24             THE COURT:  And, in fact, it may not get

25   resolved today.  If I had been told that he would have

 1   liked to be here, but he had a graduation, I would have

 2   rescheduled this for some other time.  This just may not

 3   get resolved today because I have the concern that I

 4   just expressed.

 5           MR. FISHER:  And I believe that the Acting

 6   United States Attorney does want to address any good

 7   faith considerations to the underlying motion to

 8   suppress.  However --

 9           THE COURT:  I'm sorry.  I don't understand

10   what that means?

11           MR. FISHER:  Well, if the Court has any

12   questions as to the deliberation -- well, Mr. Loucks, he

13   has the authority to -- he signed the dismissal and

14   therefore he has the power of his office that goes

15   behind me being an assistant, although the information

16   contained therein about the weaknesses in the case, that

17   came from me and the investigation I did.

18       But because there is -- under *Rinali*, in the

19   Footnote 15, which you refer to, they also -- they cite

20   *United States vs. Cowan* in that decision, and albeit

21   it's a Fifth Circuit decision, but the Supreme Court

22   does cite it in that very important footnote, that there

23   is a presumption that the government did act in good

24   faith to establish that there was no betrayal of the

25   public interest or the public trust.  And I would

1    represent to the Court that the investigation I did is

2    what made this case essentially unprovable, even though

3    at one point I feel as though I could have proven it

4    without the Santoses, necessarily.  So that there would

5    have been -- there was no taint that would have reached

6    the trial.  However, I continued to investigate that

7    cooperator.  I was going to be relying on so much at

8    trial.  That was going to be a very fruitful witness.

9    So that's what I'm --

10             THE COURT:  I read both *Cowan* and *Amadine*

11   quickly this morning, the two cases cited by the Supreme

12   Court in that footnote.  It's possible that the evidence

13   has eroded, but that dismissal of this case now, without

14   any further proceedings, will be contrary to the public

15   interest because it will abort the process which would

16   permit me to make a factual finding on whether a

17   misstatement in the DEA 6 about whether cooperating

18   witnesses were interviewed separately was deliberate or

19   not.

20             MR. FISHER:  Your Honor, and I can say that I

21   respect that -- well, I respect that, but I also

22   understand it because I myself had problems with that

23   report and that's why I drafted my letter.  However, one

24   can see as I've -- it's very easy to get sucked into the

25   quicksand of using the inappropriate word.  I'm not

1   trying to justify what the agent used because I, myself,

2   had a problem with that and that's why I wrote the

3   letter.  But referring to myself, I used the word

4   "clarify" when the Court believed I should have used the

5   word "correct."  So there isn't a trap that -- you know,

6   I write basically for a living and it seems that I fell

7   into the trap.

8              THE COURT:  Well, maybe we ought to have

9   Mr. O'Shaughnessy in and I ought to hear his explanation

10  and then I'll be in a position to see whether I -- you

11  know, how concerned I am.

12             In my **Jones** decision from May 18th, which you told

13  me last week that you read, I explained why I don't

14  regard it as sufficient to rely, say, on the Department

15  of Justice's Office of Professional Responsibility for

16  the DEA, who I believe has an Inspector General or

17  something, comparable, but my unfortunate experience,

18  since I helped establish that process in 1975, too, is

19  that it's just not right -- and I helped establish it

20  because I was the Assistant to the Attorney General of

21  the United States and the Drug Enforcement

22  Administration was my client and it was -- there were

23  allegations of misconduct at high levels of the Drug

24  Enforcement Administration, so the First Attorney

25  General Levi put in the former Watergate Special

1    Prosecutor, Chuck Roff, to deal with matters on an ad

2    hoc basis and then I think after that it became more

3    institutionalized.  But I'm reluctant to just say that

4    my referring this matter to the DEA's Inspector General

5    would be sufficient if there's reason to be concerned

6    about a deliberate misstatement.  So maybe I ought to

7    hear from Mr. O'Shaughnessy.

8            MR. FISHER:  I would suggest that may be

9    premature at this stage until you have the opportunity

10   to hear from Acting United States Attorney Loucks

11   because my understanding is that if we do -- the

12   assumption is that we had a good faith basis and I

13   represent to the Court that this is the basis for which

14   we have moved and at that point there would be no case

15   and controversy at least under this jurisdiction to --

16           THE COURT:  It would be complicated if you

17   don't want to prosecute it, but I still have to decide

18   whether it's in the public interest to -- when it's

19   clearly contrary to public interest, to dismiss the

20   case.  You know, it may be that 20 minutes of testimony

21   will take care of it and the matter can be resolved this

22   morning.

23           MR. FISHER:  That's a possibility, your Honor,

24   however, I feel uncomfortable speaking for the United

25   States Attorney and --

1          THE COURT:  He doesn't have any personal

2     knowledge of the circumstances concerning the

3     preparation of the DEA 6.

4          MR. FISHER:  I'm not sure he does.  However, I

5     think because he signed the motion to dismiss and the

6     Court would be weighing his representations as to why

7     the case needs to be dismissed, and based upon the

8     presumption that there was good faith in the fact that I

9     came here and did my best to explain what led me to

10    believe there was nonsufficient evidence, and therefore

11    to communicate that back to Acting United States

12    Attorney Loucks, that based upon that, the case, if it

13    stands, that now there's no more a case and controversy

14    for Agent O'Shaughnessy to testify about.

15         THE COURT:  No, the controversy arises under

16    the Footnote 15.  I don't feel I yet have all the

17    information necessary to decide whether dismissal of the

18    case this morning would be contrary to the public

19    interest.

20         MR. FISHER:  And that's why I keep coming back

21    to Acting U.S. Attorney Loucks, because he was the one

22    that made that deliberate decision to, that this case

23    needs to be --

24         THE COURT:  But he doesn't have the

25    information either.  He has -- did he read the

1     transcript of the May 27th hearing?

2             (Pause.)

3             THE COURT:  Look, put it this way.  Did you

4     give him the transcript of the May 27th hearing?

5             MR. FISHER:  I can tell the Court that once I

6     got that, I e-mailed it around to my supervisors.  I

7     don't remember directly sending anything to him, but my

8     understanding is that he got it.  I don't know.  But if

9     I had to guess, I would say that, yes, he did read it.

10    Now -- but I would just try to reiterate to the Court

11    that the U.S. Attorney did expect that he would be heard

12    on the motion to dismiss.  But if the Court is not so

13    inclined to --

14            THE COURT:  No, and, in fact, I would give him

15    that chance.  I don't -- if I hear from Agent

16    O'Shaughnessy, this morning, then the transcript can be

17    prepared, Mr. Loucks can read it, and he can tell me

18    what if anything he's going to do, you know, to further

19    investigate or suggest discipline concerning Agent

20    O'Shaughnessy, or I might hear the answer myself and

21    think there's nothing more that needs to be done.  But

22    this is going to have to be done at any point, in my

23    present conception, and my time is very limited.  Today

24    is the day I put aside for this case.  I wouldn't have

25    ordered Mr. Loucks to come here if he had a high school

1  graduation, but I wasn't asked to postpone this, and at

2  this point, here we are, and I'm going to deal with

3  this.

4            MR. FISHER:  Your Honor, just to -- but I am

5  not authorized to permit Special Agent O'Shaughnessy to

6  testify today, under the Tuey regulations.  I'm not able

7  to authorize that.

8            THE COURT:  That should have been raised in

9  advance.  You knew I ordered him to come here to

10 testify.  I told you that last week.  I'm not bound by

11 the Tuey regulations.

12           MR. FISHER:  However -- I'm sorry, your

13 Honor.  However, that -- we did move to dismiss the case

14 yesterday.  I realize that.  It was at noon or maybe

15 thereafter that we did it, so.  However, it was my

16 understanding that doing that, um, now there is no case

17 in controversy.

18           THE COURT:  Well, your understanding is

19 incorrect and Mr. Loucks knows it's incorrect.  He and I

20 -- the language I put in my order yesterday I took out

21 of the order I issued to him in December of 2006 in the

22 *Diaz* case, the last time he asked me to put two drug

23 dealers back on the street because the government didn't

24 turn over material exculpatory evidence after I declared

25 a mistrial and explained in detail where they needed to

1    look in the FBI files for it, because I felt I knew a

2    lot about the way the FBI kept its files.

3            MR. FISHER:  Your Honor, just to

4    differentiate, as the prosecutor in this case, the

5    person who is handling it day to day, I don't view that

6    they're dismissing it because either myself or my

7    predecessor or an agent didn't reveal exculpatory

8    evidence, because at the end of the day -- at the end of

9    the day, my brother, Attorney Fick, he knew about that

10   lockup ID, that AUSA Connolly had told him about it.

11   What transpired during '07?  I don't know.  I wasn't

12   privy to it.  But in trying to recreate the record to

13   find out how something like that fell through the

14   cracks, I've learned quite a bit about it.  So my

15   understanding is that Attorney Fick, most likely did

16   know about it, however it was not memorialized until I

17   got the case.

18        Now, I don't view that being the reason to dismiss

19   the case.  The case, literally over the course of May,

20   um, has changed and my ability to prove each and every

21   element has changed.  Would I be able to convict him on

22   this particular felony?  Possibly.  But the way it's

23   charged now?  No.  So that's what -- that's why I --

24   that's why we presented this motion.

25            THE COURT:  Well, I can assume that's true, I

1    may find that's true, but it's not the only part of the

2    public interest that's implicated here.  I'd like to get

3    this resolved ideally today or at least end our in-court

4    involvement in it.  Let me ask you one more question

5    before I perhaps call for Mr. O'Shaughnessy.

6         Do any of these issues that have prompted the

7    motion -- the request to dismiss under Rule 48(a) have

8    implications for Mr. Farias who pled guilty and is

9    scheduled to be sentenced on June 17th?  I'll ask you

10   and then this morning I had Mr. O'Leary call Mr. Garrity

11   and tell him about this hearing because I thought he

12   should have a chance to respond to that question, too.

13        MR. FISHER:  And thank you, your Honor, for

14   doing that.  I agree that that was a good position to

15   take, that he be here and be privy to this.

16        In fact, the information I gathered throughout the

17   month of May does affect his client, however it makes

18   the case against his client that much -- it actually, in

19   all, it implicates his client in this conspiracy.  So in

20   that matter it does affect him somewhat and he, of

21   course, would want to be aware of that prior to

22   sentencing.

23        The issues that the Court is concerned with with

24   the photo array and the lockup ID, that didn't involve

25   Mr. Farias at all.  In fact, he had been arrested the

1    week prior and I believe he may not have already been

2    released by that point.  So he shouldn't have even been

3    in the building that day.  And, in fact, the Santoses

4    were not able to identify him in a photo array.  So --

5    however, the two individuals I tracked down in May were

6    able to identify him in a photo array and have given us

7    quite a bit of information about his role.

8              THE COURT:  Mr. Garrity, do you feel any of

9    this has implications for Mr. Farias?

10             MR. GARRITY:  Judge, um --

11             THE COURT:  Well, let me put it this way.

12   I'll be more precise.  In certain limited circumstances

13   that I described in detail in **Ferrara**, 384 F. Supp. 2nd,

14   384, which was affirmed by the First Circuit in 456 F.

15   3rd 278, the failure to disclose material exculpatory

16   evidence, particularly negating guilt, could render a

17   plea not knowing, involuntary.  So I didn't know what

18   Mr. Fisher was going to tell me this morning about the

19   unreliable information, the erosion of the government's

20   case concerning Mr. Ocasio, and so it could be that and

21   there's that open issue, from the First Circuit decision

22   in **Santana**, that if some pattern of government

23   misconduct that's outrageous occurs, that there's

24   supervisory powers that can be exercised -- can and

25   should be exercised -- can and should be exercised to

1    dismiss a case.  But I haven't found any misconduct yet

2    at least beyond the delayed disclosure of some

3    exculpatory evidence that Mr. Ocasio is entitled to.  So

4    that's the context of the question I'm asking you.

5            MR. GARRITY:  Right.  And, Judge, just so the

6    Court's aware of where my head has been at in the last

7    month, I just finished up a murder trial late yesterday

8    afternoon and I was in there for a month, and so I saw

9    the PACER notice yesterday and that raised concerns for

10   me.  And when I tried to contact Mr. Fisher this morning

11   and wasn't able to reach him and then the Court called

12   me to come down, that was one of the questions I had,

13   that when I saw your reference to Agent O'Shaughnessy,

14   does that then raise an issue with respect to perhaps --

15   moving perhaps to vacate the prior guilty plea?  But now

16   what I'm hearing also raises further concerns in my mind

17   with respect to Mr. Farias's position in terms of the

18   sentencing, if vacating the guilty plea doesn't take

19   place.  It certainly does raise a concern.

20           THE COURT:  I think I'm going to have to give

21   you some time to absorb this and consider it with your

22   client.

23           (Pause.)

24           THE COURT:  Well, let me ask you this.  I just

25   heard, for the first time, that the Santoses identified

1   your client or am I mistaken about that?

2              MR. FISHER:  The Santoses were never able to

3   identify Mr. Farias.

4              THE COURT:  Oh, they didn't.  Okay.  Somebody

5   else did.  Okay.

6              MR. FISHER:  That's the information we learned

7   in May.  That -- I can turn the reports over, the notes

8   over to Mr. Garrity, but there have not been any DEA 6s

9   finalized for those interviews.  But I was present for

10  both of them and that's why I communicated to the Court

11  that information I had gathered.

12             THE COURT:  Well, I guess I would say the --

13  well, I'll give you time.

14             MR. GARRITY:  That's fine, Judge.  And some of

15  what was turned over to Mr. Ocasio, I'm not sure whether

16  I got it.  I can't tell you because I haven't looked at

17  the file, I haven't looked at it since my other

18  proceeding was pretty lengthy, but some of the stuff may

19  not have gotten to me.  And Agent O'Shaughnessy was a

20  key witness and Mr. Farias was arrested and Agent

21  O'Shaughnessy interrogated or questioned Mr. Farias.

22  And it certainly does raise a concern with respect to

23  credibility, what I'm hearing.  So I would ask to be

24  given everything that was given to Mr. Ocasio.

25             THE COURT:  Is there any objection to that?

1           MR. FISHER:  Oh, Judge, there's no objection

2     to that.

3           THE COURT:  All right.  How long will it take

4     you to put that together and give it to Mr. Garrity?

5           MR. FISHER:  I can't imagine it taking more

6     than a couple of weeks.  Some of the -- he may not have

7     some of the DEA 6s, that is, of statements his own

8     client gave or that had been proffered, but I'll make

9     sure that he does.

10          THE COURT:  Well, that's going to necessitate

11    my postponing Mr. Farias's sentencing.  But is that

12    something you request?

13          MR. GARRITY:  Yes, your Honor.

14          THE COURT:  Well, I think, in the

15    circumstances, the oral motion for the exculpatory

16    information or all the information that's been turned

17    over to Mr. Ocasio is meritorious.

18        When you say a couple of weeks, do you think two

19    weeks?

20          MR. FISHER:  That should be fine, your Honor.

21          THE COURT:  All right.  Well, the government

22    shall provide counsel for Mr. Farias all of the

23    information it provided Mr. Ocasio and any other

24    material exculpatory information and do that by June

25    19th.

1              And then what would you like, Mr. Garrity, a
2     couple of weeks to absorb that and discuss it with your
3     client?
4              MR. GARRITY:  If I could, your Honor.
5              THE COURT:  All right.  Then Mr. Farias shall
6     by, let's say, July 17 either file a statement that you
7     want to proceed with the sentencing or file any motion
8     you wish to file.  Okay?
9              MR. GARRITY:  That's fine, Judge.  Thank you.
10              THE COURT:  Okay.  And the government will
11     have two weeks to respond, to July 31st.
12              But you should tell me, Mr. Fisher, and all of you
13     should tell me if the schedule is going to interfere
14     with anybody's planned vacation, because I'll get a
15     response by July 31, if there's a motion, and we'll say
16     on -- if there's a motion filed and there's a response,
17     any reply will be due August 7th.  I will conduct either
18     a hearing on the motion or the sentencing on August 13th
19     at 3:00.
20              MR. GARRITY:  Judge, I'm scheduled to be on
21     vacation from August 3rd to August 17th, I believe.
22              THE COURT:  Well, then you're not going to be
23     able to reply to something.  Why don't I try to get all
24     this briefing done, if there's going to be briefing,
25     before you go.

1          Can you file your statement that you want to go

2     ahead with the sentencing or your motion by July 10th,

3     I'll give the government until July 24th to respond, and

4     the reply, if there's going to be a reply, shall be

5     filed by July 31.

6               MR. GARRITY:  That's fine, your Honor.  Thank

7     you.

8               THE COURT:  And then we'll have the sentencing

9     or hearing on any motion when you return, August 19th.

10    Okay?

11              MR. GARRITY:  That's fine, your Honor.

12              THE COURT:  All right.

13         Now, here's the one open point.  In connection

14    with the request to dismiss under Rule 48(a), I think

15    that to make a properly informed decision, I should hear

16    some testimony, which I think could be rather brief,

17    from Mr. O'Shaughnessy, unless he feels he has or wants

18    to assert some Fifth Amendment right not to testify.

19    And it's possible, when I hear the explanations, I'll be

20    satisfied and I can dismiss the case today.  And if

21    there's some open issue, the transcript will be prepared

22    and I'll have to find some time to -- probably shortly

23    after the transcript is prepared, to have further

24    discussion about it.

25         So do you want an opportunity to talk to

1    Mr. O'Shaughnessy?

2            MR. FISHER:  A recess may be fruitful, but as

3    I said before, I'm not authorized today to permit his

4    testimony under the Tuey regulation.

5            THE COURT:  Well, maybe I'll go get the file.

6    I might order him to testify.  I can go into contempt.

7    And we can go from there.

8            MR. FISHER:  Again, a recess may be fruitful

9    at this point.

10           THE COURT:  All right.  Because -- and you

11   don't have to give me the substance of it, but have you

12   talked to him about what caused him to write the DEA 6

13   the way he wrote it on the identification, "separate" as

14   opposed to "together"?

15           MR. FISHER:  Well, I spoke to him when I,

16   obviously, to draft my letter, I didn't want to draft it

17   uninformed, and he was the best witness to what actually

18   happened, um, and I can tell the Court that he used the

19   word "separately" because he used two separate photo

20   arrays.

21           THE COURT:  So if he tells me that, I might be

22   persuaded -- and I'm totally open minded, but I'm not

23   inclined to just ignore it.  You know, I may dismiss the

24   case and issue an order that suggests that DEA agents or

25   at least this one get further instruction on the form.

1    And we might be finished with this in the not so -- in a

2    short period of time.  But I'll -- it's 10 minutes of

3    11:00 and we'll resume at 5 minutes after 11:00.

4               MR. FISHER:  Thank you, your Honor.

5               THE COURT:  The Court is in recess.

6               (Short recess, 10:50 a.m.)

7               (Resumed, 11:20 a.m.)

8               THE COURT:  I see we have a new interpreter.

9    We'll have the oath administered to him.

10              (INTERPRETER, RAFAEL RODRIGUEZ, sworn.)

11              THE COURT:  Okay.  Mr. Fisher, I've looked at

12   the regulations and my discussion of them in *United*

13   *States vs. Salemme*, 978 F. Supp. 364 at 365.

14       Is the government prepared to call

15   Mr. O'Shaughnessy?

16              MR. FISHER:  Your Honor, as I said before, I

17   suggested the recess may be fruitful and it was.  We're

18   prepared to have Mr. O'Shaughnessy answer questions.

19              THE COURT:  Okay.  Excellent.  And I don't

20   want to impede this or delay it, but my reading of the

21   regulations, particularly 28 United States Code, Section

22   16.23, tells me that you're fully authorized to, on

23   behalf of the Department, in this case with the United

24   States as a party, to put him on the stand.  This

25   doesn't appear to me to be any violation of the

1  regulations or to implicate them.

2       So here's -- Mr. Fick, would you like to -- the

3  government could question first, but if you'd like, you

4  could cross-examine.  You know what I'm interested in.

5  If you don't want to examine the witness for some reason

6  because you think it might be adverse to your client's

7  interest, then I'll ask him some questions, which I may

8  probably do anyway.

9       MR. FICK:  Your Honor, I do not plan to ask

10  the witness questions.  The other thing that I would say

11  briefly is that while I certainly appreciate the Court's

12  concern with systemic issues of exculpatory evidence, my

13  duty begins and ends with Mr. Ocasio and from my point

14  of view the whole case or controversy here is about the

15  charges against Mr. Ocasio, and I do not believe it

16  could possibly be in the public interest, under the

17  circumstances, to leave him in the case.

18       THE COURT:  There's no need to argue this.

19  But have you read Note 15 of *Rinali*?

20       MR. FICK:  I have, your Honor.

21       THE COURT:  So -- it points out there may be

22  circumstances where even when the defendant and the

23  government agree, it's clearly contrary to public

24  interest to allow it.  This is going to give me some

25  information that will help me determine whether this is

1    that rare instance.  But I understand why you prefer not

2    to develop this.  Your duty is to Mr. Ocasio.  My duties

3    are broader.  So I'll let the government question

4    first.

5        Mr. Garrity, I assume you're not going to want to

6    question him either.  Or maybe you are.  I don't know.

7            MR. GARRITY:  Judge, I haven't seen the

8    reports, I don't believe that they've been discussed, so

9    I guess I'm not in a position to question at this time.

10           THE COURT:  All right.  And, in fact, I need

11   the second DEA 6.  I have the first one.

12           MR. FISHER:  Your Honor, I have copies of

13   both.  If the Clerk would like to just mark both of them

14   now?

15           THE COURT:  Sure.

16           (Hands up.)

17           MR. FISHER:  I believe I have them in the

18   correct order.  The draft is on the top.

19           THE COURT:  The DEA Report of Investigation

20   prepared by March 2, 2007 will be Exhibit 1 of today's

21   date.  The Report of Investigation prepared October 29,

22   2007 will be Exhibit 2.

23           (Exhibits 1 and 2, marked.)

24           THE COURT:  Do you have any extra copies of at

25   least the second one?

1          MR. FISHER:  I have an extra copy of the

2    first.  My brother, Attorney Fick, may have an extra

3    copy of the second.

4          MR. FICK:  I actually only have one copy of

5    the second, your Honor.  I can hand it up.

6          THE COURT:  Well, okay.  Thank you.  We'll get

7    you a copy afterwards.

8          MR. FICK:  I have more in my office, your

9    Honor.

10          (Hands up.)

11          MR. FISHER:  Your Honor, the second copies are

12   redacted.  The first copies I provided you are not.

13          THE COURT:  And do you have the -- the motion

14   to suppress has attached to it what Mr. Fick said, I

15   think -- well, let me ask you this.  Attached to the

16   motion to suppress is something that says "Photo

17   Identification Procedure."  Is that part of a form as

18   you understand it?

19          MR. FICK:  My understanding is yes, but that

20   understanding could be out of date and that's an issue

21   that we've never gotten completely to the bottom of.  I

22   obtained this form from counsel in another district

23   where there was a similar DEA array was the subject of a

24   motion to suppress, an order was issued, I think, in '07

25   or '08, I called the lawyer, I was provided with this

1    form, and it was represented to me that that form was

2    the subject of that motion.  That's where I got it and

3    that's all I know about it.

4            THE COURT:  Okay.  Thank you.  Why don't we

5    call Mr. O'Shaughnessy.

6            MR. FISHER:  Thank you, your Honor.  The

7    government calls Special Agent Michael O'Shaughnessy.

8            (SPECIAL AGENT MICHAEL O'SHAUGHNESSY, sworn.)

9            MR. FISHER:  May I proceed, your Honor?

10           THE COURT:  Yes.

11

12           ********************************

13           SPECIAL AGENT MICHAEL O'SHAUGHNESSY

14           ********************************

15

16   DIRECT EXAMINATION BY MR. FISHER:

17   Q.  Good morning, Special Agent O'Shaughnessy.

18   A.  Good morning, sir.

19   Q.  Would you please state your name for the record,

20   spelling your last name.

21   A.  Michael O'Shaughnessy, O, apostrophe,

22   S-H-A-U-G-H-N-E-S-S-Y.

23   Q.  And how are you currently employed?

24   A.  I'm a Special Agent with the Drug Enforcement

25   Administration.

1    Q.   And can you please inform the Court of the training

2    and experience you received to become a Special Agent

3    with the DEA and where you're currently assigned?

4    A.   Um, it's four months of training in Quantico

5    Virginia and extensive training in surveillance, arrest

6    techniques, cultivating witnesses, interviews, and I'm

7    currently assigned to the Boston Field Division

8    specifically in Lowell, Task Force 4, the Cross --

9    excuse me, the Cross-Borders Initiative in Lowell.

10   Q.   And how long have you been a Special Agent with the

11   Drug Enforcement Administration?

12   A.   Just over 11 years.

13   Q.   And over that 11 year career, what if any other

14   locations have you been assigned?

15   A.   Well, prior to that I was a Special Agent with the

16   U.S. Customs Service.  I was assigned in Los Angeles.  I

17   was there for approximately 7 years.  And my --

18   Q.   That was with Customs?

19   A.   That was as a Customs Agent, yes.

20   Q.   And you received training to become a Customs Agent,

21   correct?

22   A.   That's correct.

23   Q.   And what was that training?

24   A.   4 months in Glen Cove, Georgia.  Much of the same

25   training, except not with a specific focus on drugs, a

1   more broader focus on anything that can get smuggled

2   into the United States, drugs, any contraband, money,

3   munitions, child pornography, things of that nature.

4   Q.   So it's safe to say, for the past 11 years, you've

5   been working primarily on drug cases, is that correct?

6   A.   That's correct.

7   Q.   And please describe for the Court some of the cases

8   you've been working on, not specific, but the overall

9   subject matter?

10  A.   Um, the lion share of our investigations involve

11  trafficking of cocaine, heroin, um, occasionally other

12  drugs.  Sometimes marijuana.  We target drug traffickers

13  specifically that have a relationship to customers

14  coming down from Southern New Hampshire,

15  Maine and Vermont and entering Massachusetts to obtain

16  drugs in the Merrimac Valley Area, Lowell and Lawrence

17  specifically.

18  Q.   And please describe for the Court what if any

19  investigation you were working on in February of 2007

20  which involved the arrest of Juan Ocasio?

21  A.   I was the lead case agent in an investigation that

22  involved Mr. Ocasio, Mr. Farias, um, we had two other

23  um, defendants in that case as well, Jorge and Maria

24  Lorez Santos.  We received information specifically on

25  February 10th from agents in our Tampa City Task Force

1   office that there was an interdiction of a large

2   quantity of cocaine in a vehicle from California, and

3   they advised me that the two individuals that were

4   occupying the vehicle were cooperating and that they

5   wished to assist law enforcement in conducting a

6   controlled delivery.

7   Q.   And that was Jorge and Lorez Santos, correct?

8   A.   That's correct.

9   Q.   And they eventually provided information which led

10  to the DEA and yourself arresting Juan Ocasio on the

11  evening of February 21st of 2007?

12  A.   Yes.

13  Q.   Please describe for the Court what led to the arrest

14  of Mr. Ocasio on February 21st, 2007?

15  A.   Um, we conducted a controlled delivery on February

16  15th.  As a result of that controlled delivery, we

17  arrested one individual, Johan Farias, J-O-H-A-N,

18  Farias, F-A-R-I-A-S, in Lawrence.  He physically took

19  custody of the load vehicle that was utilized by the

20  Santoses and he drove it back to an address, 43 Boxford

21  Street in Lawrence.

22       Following his arrest, in an interview of him, we

23  responded to an address at 82 Boxford Street, which is

24  the residence of Mr. Ocasio.  We obtained consent to

25  search the residence and as a result of that consent

1    search, we discovered some items in the garage area that

2    were consistent with packaging that we seized during the

3    arrest of the Santoses in Kansas City.  Specifically the

4    wrappings were in black duct tape with fishing wire

5    connecting them, which would make it easier for an

6    individual to remove all items from a hidden

7    compartment.  Like I would compare it to sausage links,

8    you could grab one and pull them all out, because

9    they're attached to the fishing line.  We discovered

10   that in the garage.

11   Q.  After that evening of that consent search, who did

12   the DEA officially arrest for that delivery, it was the

13   Santoses and what additional individual?

14   A.  Johan Farias.

15   Q.  Fast forwarding to the evening of February 21st,

16   2007.  Why was Mr. Ocasio arrested that evening?

17   A.  He was arrested for his involvement as a result of

18   the discovery of the packaging from the garage and his

19   involvement with the controlled delivery.  Specifically

20   we had observed him on surveillance.  I had observed

21   him, several other agents had observed him, arriving on

22   the scene of where the -- the parking lot where the load

23   vehicle was parked.  I have specific recollections with

24   respect to the observations I made on that day.

25        We observed him, at one point, exit out -- I, at

1    one point, observed him exit out of his vehicle he was

2    driving and glaring into me, or at me, or in my

3    direction of the vehicle I was parked with with two

4    other agents and officers.

5    Q.   And using that information you gathered during the

6    investigation, there was an arrest warrant issued from

7    the U.S. Court in Boston, right?

8    A.   I believe there was, yes.

9    Q.   And that was for what you were arresting Mr. Ocasio

10   on?

11   A.   Yes, sir.

12   Q.   And that was the evening of February 21st of 2007?

13   A.   That's when we arrested him.  That's correct.

14   Q.   What happened the next day, February 22nd, 2007?

15   A.   The next day myself and a task force agent

16   transported Mr. Ocasio from a holding facility into the

17   U.S. District Courthouse.  We brought him into the Sally

18   Port here in the building and we escorted him from the

19   Sally Port into the Marshal's lockup, the holding area.

20   Q.   And was he -- please describe -- did he appear in

21   cuffs or leg shackles?  Please describe that.

22   A.   At that point, no, he was in our custody and he was

23   in handcuffs that were behind his back.  We escorted

24   him -- I escorted him with the other task force agent

25   into the holding area and he was placed with the Deputy

1    Marshal, he was placed into a holding cell at the far

2    end of the marshals' lockup area.

3    Q.  Please describe for the Court in detail how that

4    transport happened, once you got Mr. Ocasio into the

5    cell block downstairs in this building, what transpired?

6    A.  I made contact with the marshals that were present

7    and I -- I was accompanied by one Deputy Marshal and we

8    followed the Deputy Marshal into the lockup.  We opened

9    the door, entered, followed by Mr. Ocasio, myself, the

10   task force agent with me.  We then entered the lockup

11   that the Deputy Marshal directed us which cell he wanted

12   him to be placed.  I believe it was the last one on the

13   right.  We then entered and at one point the Deputy

14   Marshal conducted a personal search of Mr. Ocasio.  I

15   was present to watch.  And then during that time, when

16   we passed in front of one of the cells, I noticed that

17   there was our cooperating defendant present.  He was

18   present inside the cell block.  I believe it was the

19   very first cell block that we passed through.

20   Q.  So is it fair to say that by this point in time --

21           THE COURT:  I'm sorry.  Did you say a

22   cooperating defendant was present?

23           THE WITNESS:  He was, your Honor.

24           THE COURT:  Who was that?

25           THE WITNESS:  Jorge Santos.

1   A.   And he was -- for clarification?

2   Q.   Sure.  Can you explain what he was doing there?

3   A.   He was seated within the first cell block lockup,

4   within the cell itself.  I believe he was sitting down

5   on the bench at the time we entered the holdup area.

6   As we passed him, I glanced over and saw him and then he

7   then approached me.  I told him, at that point, that

8   there was a detention hearing for him later that

9   morning.

10  Q.   Now, at this point, this first conversation you had

11  with Mr. Santos, where was Mr. Ocasio during the

12  pendency of that conversation?

13  A.   He was being escorted into the last cell within the

14  marshals lockup.

15  Q.   Had he passed Jorge Santos's cell such as you did?

16  A.   Yes, he would have had to.  Mr. Santos's cell was

17  the one he was in at the time, it was the first cell

18  that we passed, and then Mr. Ocasio was being placed

19  into the last cell.  At that point, as the Deputy was

20  escorting him in, Mr. Santos approached me at the gate.

21  Q.   At the bars?

22  A.   Correct.

23  Q.   What if any conversation did you have with

24  Mr. Santos at that time?

25  A.   I explained to him that he had a detention hearing

1    later that morning, that we would see him in court, and

2    just to sit tight.

3    Q.   What happened next?

4    A.   I then went back to the cell where Mr. Ocasio was

5    with the Deputy Marshal, he was completing the search at

6    the time.  And then following that, I believe there was

7    a conversation about getting Mr. Ocasio's fingerprints.

8    So the Deputy Marshal then escorted Mr. Ocasio back out

9    of the holding cell and into another processing room

10   within the marshals' area outside the view of the lockup

11   where fingerprints and processing -- they're taking

12   photographs and fingerprints.  As we were exiting,

13   Mr. Ocasio and the Deputy left the room and I was

14   gestured at by Mr. Santos from inside the cell.

15   Q.   About how much time transpired from this second

16   gesture to the first conversation you had with

17   Mr. Santos?

18   A.   I would say the whole incident occurred in less than

19   5 minutes.  I would probably say it was between 1 and 5

20   minutes.  It's -- well, that's an estimate.

21   Q.   And so Mr. Santos gestures to you or waves to you as

22   you've reflected on the stand.  So what did you do in

23   response to that?

24   A.   I then approached the gate and Mr. Santos approached

25   the gate from inside.

1    Q.   And what if anything happened?

2    A.   We had a brief conversation and he was very

3    animated.  He was doing this. (Indicates.)

4    Q.   And you're pointing with your right hand?

5    A.   I'm pointing with -- my right index finger is

6    pointing towards the exit of the holding area.

7    Q.   And what if anything -- other than gestures such as

8    that, what if any verbal communication did he then give

9    you?

10   A.  He then said to me, "That's the man," "That's the

11   man," and then he did this with his hands. (Indicates.)

12   Q.   Describe what you're doing?

13   A.  He held up his hand as if to be driving a vehicle,

14   like this.  (Indicates.)  He said, "That's the man who

15   we followed.  He drove the blue car, the blue Chrysler

16   when we went to the house in Lawrence.  That's the man

17   that we followed there."  I said, "That man that just

18   passed you?"  He said, "Yes."  He further said, "That's

19   the man that we followed over to the hotel."  I said,

20   the Laquita Hotel, that's the man you followed?"  "Yes,

21   that's the man we followed down the driveway where the

22   guapa" --

23   Q.   What is a "guapa"?

24   A.   That's a colloquial expression in Spanish that I'm

25   told refers to a van, a bus, or a truck.

1  Q.  Is that the full extent of the conversation that you

2  had with Mr. Santos in that second exchange?

3  A.  Yes.

4  Q.  Now, at the time of that second verbal exchange that

5  you had with Mr. Santos, how many times did Mr. Ocasio

6  pass by the cell -- the particular cell of Mr. Santos,

7  was it one time or two times?

8  A.  Up until that second conversation, sir?

9  Q.  Well, you first told the Court that, um, that

10  Mr. Santos came from the Sally Port -- I mean, that

11  Mr. Ocasio came from the Sally Port through the cell

12  block at which time he passed the cell of Mr. Santos,

13  correct?

14  A.  That's correct.

15  Q.  And then he was fingerprinted, photographed and put

16  into a cell?

17  A.  That's correct.

18  Q.  Did he pass by the cell of Mr. Santos a second time?

19  A.  Well, I did not enter the holding area that -- I

20  guess that would be the third time he passed in front of

21  Mr. Santos's cell.  The initial time was when we first

22  entered.  He then passed in front of Mr. Santos's cell a

23  second time when the Deputy Marshals took him up for

24  fingerprinting.  And then he would have to have been

25  escorted a third time, but I wasn't present for that.

1    He passed in front of me and I stayed outside.  I did

2    not enter the holding cell on the -- I'll say the third

3    pass.

4    Q.  So you were physically present and observed two

5    passes?

6    A.  That's correct.

7    Q.  After -- well, what do you do next?  What do you do

8    after you conclude that conversation with Mr. Santos?

9    A.  At that point myself and the task force agent, um --

10   I received my handcuffs from the Deputy Marshal.  Um, I

11   then -- we then exited.  I believe I went straight to

12   the U.S. Attorney's Office and I think that the other

13   task force agent -- we had a vehicle in there, so we had

14   to pull it out of the Sally Port.  So we made

15   arrangements to get our vehicle out of the Sally Port

16   and then I went up to the ninth floor to the U.S.

17   Attorney's Office.

18   Q.  What happens later that day that was relevant to

19   this case?

20   A.  Well, I notified AUSA Connolly of what had

21   transpired in --

22   Q.  When did that happen?

23   A.  It was the same day.  I believe it was prior to the

24   next detention hearing.  So I believe it was pretty much

25   right after the incident happened.  I explained that

1    there was an identification down in the lockup.  Um,

2    then the next event was we had the detention hearing, so

3    myself and Mr. Connolly walked down to the magistrate's

4    court, and at that point I believe it was a little after

5    11:00 a.m., 11:10, I believe, and that was a detention

6    hearing for Mr. and Mrs. Santos in front of the

7    magistrate judge.

8    Q.  And were they subsequently released after that

9    hearing?

10   A.  They were, they were ordered released on electronic

11   monitoring and allowed to return home to Los Angeles.

12   Q.  What if any -- after they -- after their detention

13   hearing or their release hearing concluded, what if any

14   other contact did you have with Jorge and Lorez Santos?

15   A.  I met with the Santoses, with Mrs. Santos's

16   attorney, down at the coffee shop in the courthouse.

17   Q.  And who was representing Mr. Santos?  Did you say

18   Mr. or Mrs. Santos?

19   A.  Mrs. Santos.  It was Mr. George Gormley.

20   Q.  He was the defense attorney for Lorez Santos?

21   A.  That's correct.

22   Q.  And you met him and Lorez and Jorge down at the

23   coffee shop?

24   A.  I did, and also present was task force agent, James

25   Fay.  So we sat down at the coffee table -- we sat down

1   within the coffee shop.  Excuse me.

2   Q.  Now, what time was this, if you know, approximately?

3   A.  It was roughly -- it was after 1:00 p.m. that same

4   day.  Somewhere between 1:00 and 1:30.

5   Q.  And the Santoses had previously been released from

6   lockup?

7   A.  They had.

8   Q.  What was the purpose of this coffee shop meeting?

9   A.  Um, I wanted to meet with them, I wanted to show a

10  photo array, and I had to make arrangements to transport

11  Mr. and Mrs. Santos to Logan Airport so they could fly

12  home.  I sat down with them, Mr. Gormley --

13  Q.  Explain to the Court why the meeting was happening

14  in the -- now, you say -- is it the coffee shop on the

15  first floor or Sebastian's on the second?

16  A.  No, it was the first floor coffee shop.  So I wanted

17  to meet with them.  It was my last chance to really talk

18  with them, face to face, before they returned to Los

19  Angeles.  So I wanted to meet with them and I wanted to

20  show them some photos and I wanted to make sure that

21  they -- logistically to get them from the courthouse to

22  Logan Airport for their flight that was leaving there

23  that afternoon.

24  Q.  Explain why you decided to conduct the array at the

25  coffee shop on the first floor?

1   A.   It was the most expeditious place to conduct it at

2   the time.  I wanted to get them on the flight soon.  I

3   knew we had another detention -- excuse me, an initial

4   appearance for Mr. Ocasio that day, so we didn't have a

5   great deal of time.  And so that's why I wanted to do it

6   that way.

7   Q.   And would you describe for the Court what occurred

8   in the coffee Shop that afternoon?

9   A.   Mr. and Mrs. Santos sat down, they sat down at two

10  individual separate tables.  I then explained to them

11  that I was going to be showing them the photo array and

12  that my instructions were very clear.  I said, "You are

13  both about to view some photos.  You may or may not

14  recognize anyone in these arrays.  Their appearance may

15  have changed since these photos were taken.  If,

16  however, you do identify anyone, I would like you to

17  circle the individual number of the picture and sign the

18  array."

19  Q.   Now, are they both -- did you have to instruct them

20  twice or did you instruct them both together?

21  A.   I instructed them one time.  They were both

22  together.

23  Q.   Describe in detail for the Court how they were

24  sitting next to each other?

25  A.   I had Mrs. Santos sitting to my right facing me.

1    She was at a table.  The tables are small.  It's a

2    coffee shop.  They're very small tables.  To my left --

3    at approximately 5 to 6 feet to my left, I had

4    Mr. Santos sitting at a coffee table as I gave these

5    instructions once.

6    Q.  And they were on the same side of the table,

7    correct, they were shoulder to shoulder at the time?

8    A.  Yes, they were shoulder to shoulder, sitting down,

9    facing me.  My recollection is that Mr. Gormley was

10   seated next to Mrs. Santos.  When I produced them the

11   arrays, I did it simultaneously and I was very careful

12   to look them in the eyes as I did so.  I wanted to make

13   sure -- I wanted to ensure that they were not conferring

14   at any time, that they did not say a number or say,

15   "Hey, this looks like one."  I wanted to ensure that it

16   was not a bad identification.  As I showed them the

17   arrays, I placed them down simultaneously in front of

18   them, 1, 2.

19   Q.  So each of them had their own copy of an identical

20   array?

21   A.  That's correct.  They were identical arrays.

22   Q.  And what happened after you did that, after you

23   placed these arrays in front of Mr. and Mrs. Santos?

24   A.  I saw both Mr. Santos and Mrs. Santos circle an

25   image on the array and I instructed them, "If you have

1    identified anyone, please sign the array.  There's a

2    signature block."  I then took custody of the arrays.

3    Agent Fay signed one.  I signed one.  Agent Fay signed

4    the other.  And Mrs. Santos may have messed up and

5    signed where my signature was supposed to be.  And then

6    I took custody of the arrays.

7    Q.  About how long did this array process take from the

8    moment they sit down at the coffee shop table on the

9    first floor of the building until you collect the

10   arrays?

11   A.  I would conservatively estimate that when I showed

12   them the arrays, I would say within 5 seconds they began

13   writing on the arrays.

14   Q.  And did they each identify the same person on the

15   array?

16   A.  They did, they circled the photo numbered -- marked

17   Number 5.

18   Q.  And the person they each identified at that time was

19   Juan Ocasio?

20   A.  Yes, sir.

21   Q.  About how much time transpired, if you know, between

22   the time Jorge Santos sees Mr. Ocasio in the lockup and

23   the coffee shop photo array identification?

24   A.  That was at 9:45 and the coffee shop identification

25   was roughly between 1:00 and 3:00.

1    Q.   What happens after the conclusion of this coffee

2    shop photo array identification?

3    A.   Um, I told Mr. Gormley that we were going to be

4    taking his client and the other, Mr. Santos, over to

5    Logan.  We would transport them over to Logan and I

6    wanted to -- that's why I had Agent Fay there with me to

7    assist me in that.  We then drove them over to Logan,

8    dropped them off, um, and then I -- actually, I want to

9    correct that.  I'm not sure if I physically drove with

10   them or if Agent Fay did, to the airport.  I can't

11   recall if I physically went with them to Logan or if I

12   just told Agent Fay, "Why don't you take care of that."

13   Q.   Now, what happened to the -- well, there was another

14   detention hearing later in that day, correct, or an

15   initial appearance for Mr. Ocasio?

16   A.   Yes.

17   Q.   Were you present at that?

18   A.   I was.

19   Q.   And that was later in the afternoon on the same day,

20   February 22nd, '07, correct?

21   A.   Yes.

22   Q.   And when do you alert AUSA Connolly about the

23   results of the coffee shop photo array?

24   A.   I can't specifically recall if I told him that day

25   they identified, but I would say that it was within

1    days.  I spoke with him that day about the lockup

2    identification, but I don't recall if I said, "Yeah,

3    they identified him in a photo array," that day or if it

4    was within the following days.

5    Q.  Did AUSA Connolly provide you with any instructions

6    as to the lockup identification?

7    A.  He did.

8    Q.  What were his instructions?

9    A.  He said, "You need to write a report regarding that

10   and that's important."

11              THE COURT:  When did he tell you that?

12              THE WITNESS:  I would say he told me that

13   either that day or within days, I needed that report.

14              THE COURT:  So he told you the day of the --

15   the day that it occurred or within a couple of days?

16              THE WITNESS:  Correct, the day that it

17   occurred or within a couple of days that week.

18              THE COURT:  And what day did the events in the

19   lockup occur?

20              THE WITNESS:  Um, that was February 22nd of

21   2007.

22   Q.  And just to be clear, that was the same day of the

23   coffee shop photo array?

24   A.  That's correct.

25   Q.  The same day that the Santos had a release hearing

1    in front of Magistrate Judge Alexander, correct?

2    A.   That's correct.

3    Q.   And were released?

4    A.   Correct.

5    Q.   And that Mr. Ocasio had been brought to the

6    courthouse for his initial hearing?

7    A.   Correct.

8              MR. FISHER:  May I approach, your Honor?

9              THE COURT:  Yes.

10   Q.   Special Agent O'Shaughnessy, I'm handing you what's

11   marked Exhibit Number 1.  Would you take a look at that,

12   please.

13   A.   (Looks.)  Yes, sir.  I'm holding Exhibit 1, a report

14   that I wrote concerning the photo array identifications

15   on February 22nd.  It's signed by me.

16   Q.   Do you recognize that as the DEA 6 you drafted to

17   memorialize the coffee shop identification?

18   A.   Yes, sir.

19   Q.   And that's marked Government Exhibit Number 1?

20   A.   Yes, it is.

21   Q.   When did you draft that report?

22   A.   I drafted it on March 2nd, 2007.

23   Q.   In that report, in, I believe, the second paragraph,

24   you use the word "separately"?

25   A.   I did.

1    Q.  Can you please explain in detail for the Court what

2    you meant when using the word "separately" in that

3    sentence in that portion of the report?

4    A.  Sir, I used the word "separately" to convey my point

5    that they were not shown the same individual photo

6    array, but rather two distinctly separate, although

7    identical, arrays.  So I didn't show the two individuals

8    one array so that they could view them --

9    Q.  You mean together.

10   A.  Together.  I also used that word to, um, indicate or

11   to demonstrate that they were not sitting at the same

12   table physically looking at it, at the same table.  I

13   just wanted to make the distinction that they were at

14   separate tables and they were viewing, although

15   identical, two separate photo arrays.

16   Q.  And that report, after you drafted it, you, as a

17   policy, turned that into your supervisor and had it

18   signed?

19   A.  I did.

20   Q.  And you provided that to Attorney Connolly, correct?

21   A.  I did.

22   Q.  Why didn't you include, in that report, the

23   information about the lockup ID?

24   A.  That was a separate event.

25   Q.  And when did you draft the report for that event?

1    A.  I drafted that report months later.  The specific

2    date --

3            MR. FISHER:  May I approach, your Honor?

4            THE COURT:  Well, let's see if he's exhausted

5    his recollection.  I think maybe not.

6    A.  I specifically recall preparing that report on

7    October 29th of 2007.

8            MR. FISHER:  May I approach, your Honor?

9            THE COURT:  Why?  What's the question?

10            MR. FISHER:  May I approach, your Honor?

11            THE COURT:  No.  I want to know why.  Ask a

12    question.  Is there something you want to show him?

13            MR. FISHER:  I did want to show him something.

14            THE COURT:  Well, first of all, you'll have to

15    use the document presenter.  Second of all, I don't know

16    whether it's necessary or appropriate to show him his

17    report right now.

18            (Pause.)

19            THE COURT:  Well, the document presenter is

20    not working.  But what's the question?

21    Q.  Special Agent O'Shaughnessy, you testified that you

22    drafted that report in October of 2007?

23    A.  Yes.

24    Q.  Why the delay?

25    A.  Well, the simple answer is I forgot.  I was -- AUSA

1    Connolly told me, within days, to write the report.  He

2    then reminded me -- I do remember him reminding me, at

3    least two other times, to write the report.  I might add

4    that this whole investigation began during the middle of

5    a wiretap investigation which I was the affiant.  There

6    was a lot going on.  I had 10-day reports and 20-day

7    reports.  I neglected to write it within the proper

8    amount of time.  And I forgot.  He reminded me

9    subsequent to that.  I do remember that.  And with all

10   the other reports and other responsibilities I had, I

11   forgot.

12   Q.  But, in fact, you testified that you had alerted

13   AUSA Connolly to the fact that a lockup ID had happened,

14   correct?

15   A.  I did.  It was that day.

16   Q.  And you had a helpful conversation with him about

17   drafting the report, correct?

18   A.  I did.

19   Q.  Did you bring a copy of that report with you today?

20   A.  I did.

21            MR. FISHER:  May I approach, your Honor?

22            THE COURT:  To do what?

23            MR. FISHER:  To enter the report into

24   evidence.

25            THE COURT:  Well, you already entered both of

1    them into evidence.  That's Exhibit 2, isn't it?

2           MR. FISHER:  It is.  I didn't know if you

3    wanted me to do it officially with him identifying it.

4    That's the only reason I'm asking him.

5           THE COURT:  Go ahead.  You can show it to him.

6    Q.  Special Agent O'Shaughnessy, I'm showing you what's

7    marked Exhibit 2.  Would you take a look at that and

8    tell us if you recognize what that is?

9    A.  Sir, I recognize this as the report that I prepared

10   concerning the lockup identification which occurred on

11   February 22nd, 2007.

12   Q.  And as per DEA policy, you turned that into your

13   supervisor and had that signed off on, correct?

14   A.  I did.

15          MR. FISHER:  No further questions, your Honor,

16   regarding these issues.

17          THE COURT:  Well, you may want to look in your

18   file.  Do you have any notes or other information that,

19   in the context of the testimony we just heard, reflects

20   prior inconsistent statements?

21          MR. FISHER:  On behalf of who?

22          THE COURT:  Well, prior inconsistent

23   statements of this witness or anybody else who provided

24   information that would contradict the information that I

25   just heard?

1          MR. FISHER:  You mean any other DEA 6 report?

2          THE COURT:  No, any other information.  Any

3    notes.  You told me that you've retained the notes and

4    reviewed them.

5          MR. FISHER:  I did, correct.

6          THE COURT:  You need to look in your file to

7    see whether there's anything, any information that is

8    inconsistent with what I just heard, because if it is,

9    you need to turn it over.

10          MR. FISHER:  The notes which Special Agent

11   O'Shaughnessy drafted were turned over to my brother.  I

12   have them.  I've reviewed him.  They reflected the

13   lockup ID, which was then generated within.

14          THE COURT:  Well, let me have the notes.  I'll

15   take those notes.

16          MR. FISHER:  Yeah, I didn't bring my copy of

17   the notes.  My brother may have his.

18          THE COURT:  What about Mr. Fay, did you talk

19   to him about this matter?

20          MR. FISHER:  I can ask Special Agent

21   O'Shaughnessy --

22          THE COURT:  No, did you talk to him about this

23   matter?

24          MR. FISHER:  Did I talk to Special Agent

25   O'Shaughnessy?

1          THE COURT:  Okay.  Who was present for the

2    identification?

3          THE WITNESS:  Task Force Agent Fay for the

4    photo identification.

5          THE COURT:  By what agency is he employed?

6          THE WITNESS:  He's currently employed with the

7    Lowell Police Department.

8          THE COURT:  So my question is, which I also

9    asked you last week, have you talked to Mr. Fay?

10          THE WITNESS:  No.

11          THE COURT:  You still haven't talked to

12    Mr. Fay.  So you don't know whether Mr. Fay would

13    contradict anything that Agent O'Shaughnessy said in his

14    DEA 6s or in his testimony today?

15          MR. FISHER:  I am not aware of any information

16    that TFA Fay has regarding that --

17          THE COURT:  No, that's not correct.  That's

18    not the question I asked you.  I went over this with you

19    on May 27th.  You have an obligation to go to each

20    agency, like the Lowell Police, and the people with

21    knowledge, and ask them.

22          MR. FISHER:  Your Honor, the reason I didn't

23    do that, since May 27th, your Honor, is because we made

24    the decision to dismiss the underlying case.

25          THE COURT:  Look, I gave you orders and I

1    asked you this morning whether you -- it's in the

2    transcript, whether you got all the notes, whether you

3    produced all material exculpatory evidence by June the

4    1st, and you didn't tell me previously, "No, we didn't

5    obtain and produce all exculpatory evidence by June the

6    1st, because we decided to dismiss the case."  I don't

7    see --

8              MR. FISHER:  What I did was I gathered all

9    notes and redacted information which had to do with

10   other investigations and then I turned them over to my

11   brother.

12             THE COURT:  Did you ask Mr. Fay if he had any

13   notes?

14             MR. FISHER:  Special Agent O'Shaughnessy asked

15   Mr. Fay if he had any notes.

16             THE COURT:  Yeah, it's your obligation.  Do

17   you remember we went over this last week?  Well, that's

18   one.  Two, do you recall that you said, on May 27th,

19   that you understood that you had an obligation to obtain

20   and disclose material exculpatory evidence, including

21   impeaching evidence, even if it wasn't written down?

22             MR. FISHER:  I did, your Honor, but because I

23   didn't -- I wasn't going to present evidence -- I wasn't

24   going to present any evidence, so --

25             THE COURT:  I gave you an order.  You said you

1    understood it.  I didn't relieve you from the order.

2    And you told me earlier that you obeyed it, that you

3    produced all material exculpatory evidence by June 1.

4              MR. FISHER:  Correct.

5              THE COURT:  That's what you said.

6              MR. FISHER:  That's what I said and that's

7    what I believe I did.  I spoke to the agent who

8    collected every piece of paper throughout the case and I

9    turned it over to my brother.  However, at that time, I

10   didn't anticipate having an evidentiary hearing.  I

11   didn't plan on calling -- I didn't ask to call this

12   witness.

13             THE COURT:  Well, you filed it about noon on

14   June 4th, a motion to dismiss, a request a dismiss, and

15   nobody asked me to alter the order I gave you.  So as

16   far as I'm concerned, you just disregarded the order.

17        Now --

18             MR. FISHER:  I didn't --

19             THE COURT:  What I'm doing is offering you now

20   an opportunity to go through your files to see whether

21   there's anything you should give me that might impeach

22   anything I've heard.  You may feel you don't need to do

23   that.  But I just want to make sure I have what I need

24   to ask the questions I'm going to ask.

25             MR. FISHER:  If the Court would like, since I

1    provided them to my brother, I could provide the notes

2    to you.

3              THE COURT:  I've asked for the notes.

4              MR. FISHER:  Yes.

5              (Hands up.)

6              THE COURT:  Whose notes are these?

7              MR. FISHER:  They are Special Agent

8    O'Shaughnessy's.  I can show them to him.  But those are

9    the ones that were provided to me from him.

10             THE COURT:  All right.  But did you take notes

11   prior to sending the letter to Mr. Fick on May 22nd,

12   2008?

13             MR. FISHER:  I did not.

14             THE COURT:  And did the letter reflect what

15   you told -- what Mr. O'Shaughnessy told you previously?

16             MR. FISHER:  It does reflect that.

17             THE COURT:  All right.  It's my view that you

18   haven't obeyed my order and looked for all material

19   exculpatory information.  But I understand you to be

20   representing that you've disclosed what you had?

21             MR. FISHER:  Yes.

22             THE COURT:  You have a continuing obligation,

23   if in going through your file, you find additional

24   information that would be impeaching, I'm ordering you

25   to give it to me, even if it turns out the case has been

1     dismissed.  Do you understand?

2               MR. FISHER:  I do understand.

3               THE COURT:  All right.  Mr. O'Shaughnessy, I'm

4     going to ask you some questions that I -- that relate to

5     the decision I need to make as to whether it's

6     appropriate to dismiss the case against Mr. Ocasio as

7     has been requested.

8               THE WITNESS:  Yes, your Honor.

9               THE COURT:  Do you understand that you, like

10    any witness, have a right under the Fifth Amendment not

11    to answer any question if the answer to that question

12    might tend to incriminate you?

13              THE WITNESS:  I do.

14              THE COURT:  Do you understand that making --

15    knowingly and willfully making a false material

16    statement in a report like a DEA 6, at least in my view,

17    would be a prosecutable offense under 18 United States

18    Code, Section 1001?

19              THE WITNESS:  I'm aware of that.

20              THE COURT:  So if at some point, because you

21    think you have a valid Fifth Amendment right that you

22    want to exercise, you don't want to answer a question,

23    do you understand that you should just tell me that?

24              THE WITNESS:  I do.

25              THE COURT:  Did you receive -- well, let me

1    see.  Who have you talked to about matters relating to

2    this case since May 27th?

3              THE WITNESS:  The prosecutors.  The AUSA in

4    this case.  Mr. Fisher.  A FLEOA attorney.

5              THE COURT:  Who is that?

6              THE WITNESS:  A FLEOA attorney.

7              THE COURT:  What is FLEOA?

8              THE WITNESS:  It's the Federal Law Enforcement

9    Officer's Association.  It's a fraternal order.  I

10   discussed the case with him.

11             THE COURT:  Okay.

12             THE WITNESS:  I advised my supervisor that I

13   had a sequestration order.  But those are the attorneys

14   that I spoke with.

15             THE COURT:  Have you talked to anybody other

16   than an attorney?

17             THE WITNESS:  No other witness.  No, sir.

18             THE COURT:  Okay.  Have you talked to

19   Mr. Fay?

20             THE WITNESS:  I have not.

21             THE COURT:  Did you say you began your career

22   in Federal law enforcement as a Customs Agent?

23             THE WITNESS:  I did, sir.

24             THE COURT:  And you were trained in Glen Cove,

25   Georgia?

 1                    THE WITNESS:  Yes.

 2                    THE COURT:  For about how long?

 3                    THE WITNESS:  Approximately 4 months.

 4                    THE COURT:  And did that training include

 5      training on how and when to write reports of your

 6      activities?

 7                    THE WITNESS:  It did, sir.

 8                    THE COURT:  Do you recall what things were

 9      emphasized as being particularly important in writing a

10      law enforcement report?

11                    THE WITNESS:  Yes.

12                    THE COURT:  What?

13                    THE WITNESS:  The events that occurred.  The

14      statements that are made.  Above all to report the truth

15      and report it accurately and succinctly.

16                    THE COURT:  I'm sorry.  What was the last

17      thing you said?

18                    THE WITNESS:  Accurately and succinctly.  To

19      be thorough.  And to report things on a timely basis.

20                    THE COURT:  So accuracy was emphasized as

21      being important?

22                    THE WITNESS:  It was, sir.

23                    THE COURT:  And preparing reports on a timely

24      basis was emphasized as being important?

25                    THE WITNESS:  It was, sir.

1          THE COURT:  And being truthful was emphasized
2     as being important?
3          THE WITNESS:  Yes, sir.
4          THE COURT:  And did Customs have standards and
5     procedures with regard to how quickly after events
6     reports were to be prepared, during the period you were
7     a Custom's agent?
8          THE WITNESS:  Yes.
9          THE COURT:  And in terms of how quickly a
10    Customs investigative report was to be prepared, what
11    was the time period, if any?
12         THE WITNESS:  I don't specifically recall what
13    exact -- how many days or how many incidents.  I don't
14    specifically recall.  That agency wasn't as regimented
15    as the DEA is.  But I do know that it was in a timely
16    manner.
17         THE COURT:  For Customs?
18         THE WITNESS:  For Customs.
19         THE COURT:  In your training as a Customs
20    agent, were you trained in conducting identification
21    procedures?
22         THE WITNESS:  I believe it came up, yes.
23         THE COURT:  Do you recall what you were
24    instructed in that training?
25         THE WITNESS:  Um, I don't recall -- it was a

1    long time ago.  I don't recall photo arrays or -- I
2    remember we discussed lineups, photo arrays, show-ups,
3    um, but I don't have any specific recollection
4    concerning the procedures.
5              THE COURT:  And how long did you serve as a
6    Customs agent?
7              THE WITNESS:  Approximately 7 years.
8              THE COURT:  Did you conduct any identification
9    procedures as a Customs agent?
10             THE WITNESS:  I -- I'm sure I was present
11   during them.  I don't have specific recollection
12   concerning a number.  I don't recall exactly if I've
13   done one before as a Customs agent.
14             THE COURT:  Were you instructed as a Customs
15   agent in Glen Cove or anyplace else as to whether
16   identification procedures should be conducted separately
17   or together if there was more than one witness being
18   asked whether he or she could make an identification?
19             THE WITNESS:  I don't recall.
20             THE COURT:  When did you become a DEA agent?
21             THE WITNESS:  November of 1997.
22             THE COURT:  And did you say you were trained
23   at Quantico as a DEA agent?
24             THE WITNESS:  I was, sir.
25             THE COURT:  Were you trained with regard to

1    making reports of your activities?

2               THE WITNESS:  Yes.

3               THE COURT:  And what were you taught was

4    particularly important in connection with making

5    reports?

6               THE WITNESS:  Among other things, that I had

7    approximately 5 days, 5 to 7 days to generate and

8    prepare a report.  The dates are slightly different for

9    certain reports.  Um, a case initiation report and a CS

10   debriefing report, you are instructed in the manual to

11   prepare and generate a report within 5 days.  If it's

12   any other report, it's within 7 days.

13              THE COURT:  And other than time, do you recall

14   being taught that certain other things were important in

15   preparing DEA reports?

16              THE WITNESS:  Yes, your Honor.

17              THE COURT:  What?

18              THE WITNESS:  Similar to, as a Customs agent,

19   to be truthful, articulate, thorough.

20              THE COURT:  And accurate?

21              THE WITNESS:  And accurate.

22              THE COURT:  And did you receive at Quantico or

23   anyplace else, as a DEA agent, instruction on conducting

24   identification procedures?

25              THE DEFENDANT:  I know we discussed them.  I

1    know we didn't do any practical exercises.  I don't

2    recall that.  But I'm sure we must have talked about

3    them and been instructed about them, about photo

4    identifications, lineups and show-ups.  I'm sure we

5    discussed that.

6            THE COURT:  When you use the term "show-up,"

7    what are you describing?

8            THE WITNESS:  If you have a witness, um, to a

9    crime and you have individuals that are on the street,

10   um, you can ask that person and say, "Do you recognize

11   anybody here?"  I believe that's a "show-up".  I believe

12   that's what I was referring to.

13           THE COURT:  Does a DEA agent, is there a

14   manual of standards and procedures available to you?

15           THE WITNESS:  There is, sir.

16           THE COURT:  And is there a section in that

17   manual on identification procedures?

18           THE WITNESS:  There is.

19           THE COURT:  Have you read it?

20           THE WITNESS:  I read it -- I've read it

21   recently, yes.

22           THE COURT:  Did you read it before February

23   22nd, 2007?

24           THE WITNESS:  I don't believe I did, sir.

25           THE COURT:  Are there forms that DEA has

```
 1    for -- to be used in connection with conducting

 2    identification procedures?

 3              THE WITNESS:  I believe there are forms now.

 4              THE COURT:  Were there forms in February of

 5    2007?

 6              THE WITNESS:  I don't recall if there were,

 7    your Honor.  I'm not sure if they were generated after.

 8    Our agent's manual does change.  We have updates.  I

 9    just do not recall if there was a form that was

10    generated prior to February of '07.

11              THE COURT:  Did you read Mr. Ocasio's motion

12    to suppress tainted identification procedures?

13              THE WITNESS:  Um, I read the sequestration

14    order.  Um --

15              THE COURT:  This is a motion that was filed on

16    about June 9, 2008.  About a year ago.

17              THE WITNESS:  I don't recall reading it.

18              THE COURT:  Were you told it was filed?

19              THE WITNESS:  I was.

20              THE COURT:  Did you discuss it with Mr. Fick

21    or some other prosecutor?

22              THE WITNESS:  I discussed it with the

23    prosecutor, yes.

24              THE COURT:  Not Mr. Fick.  I misspoke.

25    Mr. Fisher.
```

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Did you look at any of the

3     attachments to the motion?

4          THE WITNESS:  I don't believe I did.

5          THE COURT:  Does somebody have a copy of the

6     motion with the attachments?  Here, Dennis, just show

7     him.

8       I'm going to show him the last page, it says

9     "Photo Identification Procedure."

10          (Shows.)

11          THE COURT:  Which I'll make Exhibit 3.

12          (Exhibit 3, marked.)

13          THE WITNESS:  (Reads.)

14          THE COURT:  Take whatever time you need to

15    read it, but the question I'm going to ask you is

16    whether you've seen that form before or forms

17    substantially like it?

18          THE WITNESS:  I've seen this form before.

19          THE COURT:  When did you see it?  When did you

20    first see it?

21          THE WITNESS:  Thursday of last week.

22          THE COURT:  Had you ever seen it before

23    February 22, 2007?

24          THE WITNESS:  I don't recall ever reading the

25    identification procedure within the manual.

1          THE COURT:  Who showed you the form last week?

2          THE WITNESS:  Mr. Fisher.

3          THE COURT:  Was that before or after the

4    hearing on May 27th?

5          THE WITNESS:  It would have been after.

6          THE COURT:  Okay.  And look at Paragraph 4 of

7    that document, please.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Can you read what I think is the

10   second part of that paragraph that has some -- it has

11   two words in all capital letters.

12         THE WITNESS:  Yes.

13         THE COURT:  Please read it out loud.

14         THE WITNESS:  "Where there is more that one

15   witness, each should view photos separately, not in each

16   other's presence."  The word "separately" is in all

17   caps.  The word "not" is in all caps.

18         THE COURT:  All right.  Do you recall whether

19   you've ever received those instructions in your training

20   or experience as a Customs agent or DEA agent?

21         THE WITNESS:  I don't recall if I have.  I

22   just --

23         THE COURT:  Have you looked to see whether

24   that form or those instructions are in the DEA manual?

25         THE WITNESS:  I have.  I looked it up in the

 1     manual and it's accurately reflected on this page.

 2            THE COURT:  So what you just read is now in

 3     the DEA manual?

 4            THE WITNESS:  It is now, sir.

 5            THE COURT:  Did you check to see whether the

 6     effective date that the provision indicated, whether it

 7     was in the DEA manual before February 22 of 2007?

 8            THE WITNESS:  Your Honor, I do remember

 9     looking for it, I just -- I couldn't find it on that.

10     It's automated, so I couldn't find it on the sheet that

11     I was reviewing, when the effective date was.

12            THE COURT:  Well, for some purposes, the

13     Department of Justice puts the dates on.  For example,

14     Section 9-5.001 of the U.S. Attorney's manual says it

15     was updated in October, 2008.

16        All right.  I'm going to have to get that back.

17            (Gets back.)

18            THE COURT:  Where it says what you just read,

19     "Where there is more than one witness, each should view

20     photos separately, not in each other's presence."  Does

21     that communicate to you that the Drug Enforcement

22     Administration interpret "separately" to mean not in the

23     presence of another person also being asked to make an

24     identification?

25            THE WITNESS:  Yes, it does.

1          THE COURT:  All right.  Have you, since May

2     27th, discussed with Mr. Fisher why you wrote

3     "separately" in the DEA 6 report, that's Exhibit 1, when

4     the Santoses were in each other's presence when they

5     were asked to make identifications?

6          THE WITNESS:  We've discussed that before and

7     after the May hearing of last week.

8          THE COURT:  And do you generally understand

9     the word "A," as in "a" person, to mean one person and

10    not more than one person?

11         THE WITNESS:  I do, your Honor.

12         THE COURT:  Is that how you usually use the

13    term "a"?

14         THE WITNESS:  "A" refers to singular versus

15    the plural.

16         THE COURT:  Now, please tell me again.  When

17    you had the Santoses in the coffee shop, who was present

18    and how each person was seated or placed?

19         THE WITNESS:  Your Honor, yes.  Task Force

20    Agent James Fay.  Myself, obviously.  Mr. and

21    Mrs. Santos.  And Mr. Gormley.  (Indicates.)

22         THE COURT:  Okay.  You're going to have to

23    explain it in words, because it has to be reflected on

24    the record and I'm having trouble following your hands

25    with that computer screen there.

1              THE WITNESS:  Sure.  I apologize, your Honor.

2       Task Force Agent Fay, myself, Mr. and Mrs. Santos and

3       Mr. Gormley were present.  Um, I sat in front of both

4       Mr. Santos and Mrs. Santos as they sat at a table in the

5       coffee shop.

6              THE COURT:  So you were across the table from

7       them?

8              THE WITNESS:  I was across.  There were two

9       separate tables.  They were seated at an individual

10      table, each of them, and the tables are fairly small.

11      Almost the size of a student's desk, I would say.  They

12      sat across from me.  They were approximately 5 to 6 feet

13      in distance from one another.  I sat directly across

14      from them in the middle.  As I looked, I had Mr. Santos

15      on my left.  My recollection is that I had Mrs. Santos

16      on my right.  And my recollection is that I had

17      Mr. Gormley also was seated at a table in the coffee

18      shop.  Task Force Agent Fay was seated somewhere behind

19      me or to the left of me to witness this.  Outside of the

20      proprietor of the coffee shop, I didn't observe any

21      other people there.  I don't recall any other people

22      being there.  Um --

23              THE COURT:  Okay.  So there was nobody between

24      Mr. Santos and Mrs. Santos, correct?

25              THE WITNESS:  I would say there was nobody

1    present.  I was seated across from them in front, so I

2    would say there was no one physically seated between the

3    two.

4             THE COURT:  And you say these were small

5    tables?

6             THE WITNESS:  Yes.

7             THE COURT:  Were the tables touching each

8    other or was there a space between the tables?

9             THE WITNESS:  Definitely a space between the

10   two.

11            THE COURT:  How big a space?

12            THE WITNESS:  As I said about, roughly, 5 to 6

13   feet in distance, approximately.

14            THE COURT:  And did you testify earlier that

15   the Santoses were shoulder to shoulder?

16            THE WITNESS:  I don't recall saying the phrase

17   "shoulder to shoulder" earlier in my testimony.

18            THE COURT:  Have you ever described them as

19   being "shoulder to shoulder"?

20            THE WITNESS:  In a report or in testimony,

21   your Honor?  Just for clarification.

22            THE COURT:  Have you ever -- it doesn't have

23   to be a report or testimony.  Have you ever said, orally

24   or in writing, that the Santoses were "shoulder to

25   shoulder" during the procedure?

1          THE WITNESS:  I don't recall if I have ever

2     uttered those words.

3          THE COURT:  I think the record will -- were

4     they shoulder to shoulder?

5          THE WITNESS:  They were not shoulder to

6     shoulder, they were not sitting -- their shoulders were

7     not physically in contact with one another during the

8     photo identification.

9          THE COURT:  Were their shoulders near each

10    other?

11         THE WITNESS:  Um, as they were seated?

12         THE COURT:  Yeah.

13         THE WITNESS:  Um, I'd say about 5 to 6 feet

14    apart.  I guess that's --

15         THE COURT:  Did you ever -- did you ever tell

16    Mr. Fisher that the Santoses -- here, were seated

17    "shoulder to shoulder during the identification

18    procedure"?

19         THE WITNESS:  I don't recall what words I may

20    have used in the past in conversations with Mr. Fisher.

21         THE COURT:  Did you read, at any time, the

22    letter that he sent Mr. Fick concerning this matter --

23         THE WITNESS:  Um --

24         THE COURT:  -- correcting and clarifying

25    whether the Santoses were separate or together when

1    their identification procedures were conducted?

2              THE WITNESS:  I don't recall ever reviewing

3    that memo.

4              THE COURT:  That Exhibit 3, the document on

5    the photo identification procedure.

6              THE WITNESS:  That was just shown to me?

7              THE COURT:  Yes.

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  When did you first read that?

10             THE WITNESS:  I read it last week in

11   Mr. Fisher's office.  It was either Thursday or Friday

12   of last week.

13             THE COURT:  Was it a separate single piece of

14   paper or was it attached to something?

15             THE WITNESS:  I can't recall.  Um, I can't

16   recall if it was stapled or paper clipped.  I don't

17   recall.  I remember viewing it in his office.

18             THE COURT:  Let me -- I'm trying to understand

19   your testimony.  Is it your testimony that Mr. Santos

20   was at one table, Mrs. Santos was at another table, and

21   they were about 5 or 6 feet from each other even though

22   they were small tables?

23             THE WITNESS:  That's correct.

24             THE COURT:  And you simultaneously put

25   identical photo arrays, but there were two photo arrays

1   in front of each of them?

2           THE WITNESS:  Yes, there was Photo Array 1,

3   Photo Array 2, they're identical, yes.

4           THE COURT:  Where were you seated?

5           THE WITNESS:  I was seated across from them

6   between -- I sat between them, um, across from their

7   chairs as they were facing me.

8           THE COURT:  Were you at a table?

9           THE WITNESS:  I believe I was seated.  I don't

10  recall if there was a table in front of me.  I don't

11  recall, sir.

12          THE COURT:  But you recall that -- did you

13  have two photo -- two sets of the photo array?

14          THE WITNESS:  Yes.

15          THE COURT:  So in that sense there were two

16  photo arrays?

17          THE WITNESS:  That's correct.  Yes.

18          THE COURT:  All right.  And you gave them the

19  photo array simultaneously?

20          THE WITNESS:  Yes, your Honor.

21          THE COURT:  From a seated position?

22          THE WITNESS:  I may have sat up in my chair to

23  reach over to either one, but my recollection is I was

24  seated.

25          THE COURT:  Do you think you got a 6 foot wing

 1   span?

 2              THE WITNESS:  From 5 to 6.  I'm about 5 foot

 3   10.  They always told me that this was about my height.

 4   (Indicates.)  So I don't think I did this, but I --

 5   well, I don't have a 6 foot wing span.

 6              THE COURT:  Yeah.  And you could comfortably

 7   put the two separate photo arrays down on each table?

 8              THE WITNESS:  Um, yeah, shifting a little

 9   bit.  Yes.  I'm pretty flexible. (Indicates.)

10              THE COURT:  And you don't remember saying

11   that:  "The Santoses were seated next to one another,

12   shoulder-to-shoulder style."

13              THE WITNESS:  I don't recall using those

14   words.

15              (Pause.)

16              THE COURT:  Well, let's see if it refreshes

17   your recollection.  Would you show him, please,

18   Mr. Fisher, your May 22, 2008 letter.

19              MR. FISHER:  Do you want to have it marked,

20   your Honor, before I show it to him?

21              THE COURT:  You can show it to him.

22              (Shows witness.)

23              THE COURT:  Have you read that letter?

24              THE WITNESS:  This is the first time I've seen

25   this letter.  I've read it.

1              THE COURT:  Do you see that it says:  "The
2      cooperators were seated next to one another shoulder-to-
3      shoulder style"?
4              THE WITNESS:  I do see that, sir.
5              THE COURT:  Is it your position that you
6      didn't tell that to Mr. Fisher or just that you don't
7      remember saying that to Mr. Fisher?
8              THE WITNESS:  It's my position, sir, that I
9      don't remember uttering the words "shoulder-to-shoulder
10     style" to Mr. Fisher.
11             THE COURT:  Do you recall saying earlier in
12     your testimony, when Mr. Fisher was questioning you, and
13     asked:  "And they were on the same side of the table?"
14     "Correct."  "So they were shoulder to shoulder at the
15     time?"  And answering, "Yes, they were shoulder to
16     shoulder facing me"?
17             THE WITNESS:  Your Honor, if that's my
18     testimony, sir, I must have uttered it.  I --
19             THE COURT:  I'm talking about earlier today.
20             THE WITNESS:  Earlier today?  Um, if I uttered
21     those words, I didn't mean, when I said that, that their
22     shoulders were physically in contact, but that their
23     shoulders were aligned or facing in the same direction.
24             THE COURT:  Well, why don't we mark that
25     letter as Exhibit 4.

1                    (Exhibit 4, marked.)

2              THE COURT:  Was it your understanding that

3      when you -- well, did you have an understanding at the

4      time you did the photo identification procedure on

5      February --

6              THE WITNESS:  22nd.

7              THE COURT:  -- 22nd as to whether it was

8      proper or most appropriate to do it separately or

9      together?

10             THE WITNESS:  At the time or in hindsight?

11             THE COURT:  No, at the time, did you have an

12     understanding as to the appropriate way to conduct the

13     procedure, separate or together?

14             THE WITNESS:  At the time?  Um, I just don't

15     recall what was going through my head.

16             THE COURT:  Well, you had been educated to put

17     in your reports what was important, right?

18             THE WITNESS:  Yes, your Honor.

19             THE COURT:  And do you recall, in Exhibit 1,

20     which is the DEA 6 you prepared on March 2, 2007, you

21     wrote:  "During the debriefing, CS-1 and CS-2 were

22     separately displayed a photo array each containing 8

23     images of Hispanic males"?

24             THE WITNESS:  I recall writing that, yes.

25             THE COURT:  And did you write "separately"

1    because you understood there was some importance to

2    whether the photo identification procedure was conducted

3    separately with each?

4              THE WITNESS:  I wish to convey that there were

5    two separate arrays and there was --

6              THE COURT:  No, my question is different.

7              THE WITNESS:  I'm sorry, your Honor.

8              THE COURT:  You thought it was important

9    enough to make the point that they were separately

10   displayed, the photo arrays.

11             THE WITNESS:  I did.

12             THE COURT:  Okay.  Because you were trained to

13   be, in writing reports, succinct and accurate and to

14   include things that were important and truthful.

15   Right?

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  And you wrote that "They were

18   displayed a photo array each containing 8 images."

19             THE WITNESS:  That's what I wrote, your Honor.

20             THE COURT:  In retrospect, would it have been

21   more accurate for you to have written that the

22   identification procedures were conducted with CS-1 and

23   CS-2 together and they were each displayed duplicate

24   photo arrays, each containing 8 images of Hispanic

25   males?

1        THE WITNESS:  That would have been more

2   accurate.  I ought to have used another -- well, I

3   wanted to express that they were simultaneous, but they

4   weren't physically looking at the same array.  I ought

5   to have written more appropriate verbiage to convey,

6   both accurately and truthfully, that it was not a photo

7   array, but rather, um, this two distinct photo arrays,

8   and that sentence is in error.

9        THE COURT:  You prepared this on March 2,

10   2007, correct?

11        THE WITNESS:  I did.

12        THE COURT:  And you said that Mr. Connolly had

13   told you -- let me ask you this.  Did you prepare any

14   other reports relating to Mr. Ocasio before March 2,

15   2007?

16        THE WITNESS:  Um, I'm sure I wrote other

17   reports concerning the arrest before March 2nd.  I don't

18   know what those dates are, but I'm sure I wrote some

19   other reports.

20        THE COURT:  Do you have those reports here,

21   Mr. Fisher?

22        MR. FISHER:  The reports that relate to --

23        THE COURT:  Any of the reports that he wrote

24   between February 22 and March 2nd that relate to

25   Mr. Ocasio.

1          MR. FISHER:  I don't have the entire -- I
2     don't have the entire discovery file.  I'm not sure --
3     there may be.  There may possibly be.
4          THE COURT:  Well, my question is do you have
5     them in the courtroom?
6          MR. FISHER:  No, I didn't bring the entire
7     discovery file, your Honor.
8          THE COURT:  Do you have those reports,
9     Mr. Fick?
10          MR. FICK:  I do not, your Honor.
11          THE COURT:  You don't have them here or you
12     didn't receive them?
13          MR. FICK:  I don't have them here, but I've
14     received them, your Honor.
15          THE COURT:  Well, either before February 22nd
16     or shortly within a few days thereafter, I think --
17     well, did Mr. Connolly, the prosecutor at that time,
18     tell you to put in a report that Mr. Santos saw
19     Mr. Ocasio in the lockup and told you that he identified
20     him?
21          THE WITNESS:  He did.
22          THE COURT:  And when did he tell you to put
23     that information in a report?
24          THE WITNESS:  I would say initially within
25     days of the lockup identification.

1          THE COURT:  Did you testify earlier today that

2   it was either the same day or it was within days

3   afterwards?

4          THE WITNESS:  I did.  It was either the same

5   day or within days of the incident occurring.

6          THE COURT:  Is it your best memory that it was

7   before March 2nd, 2007?

8          THE WITNESS:  Yes.

9          THE COURT:  And did you put that information

10  in any report including this Exhibit 1 before March 2nd,

11  2007?

12         THE WITNESS:  I'm not following you, your

13  Honor.  You mean --

14         THE COURT:  Did you put the information

15  concerning the identification in the lockup in any

16  written report that you prepared before March 2nd,

17  2007?

18         THE WITNESS:  I don't recall that.

19         THE COURT:  You don't recall whether you did

20  or not or you don't remember doing it?

21         THE WITNESS:  I don't -- I don't recall

22  writing a report concerning the photo identification

23  before March 2nd, no.

24         THE COURT:  Okay.  I think you're confused,

25  perhaps, by my question.

```
 1                    THE WITNESS:  I am.

 2                    THE COURT:  Now I'm asking you about the

 3         lockup.

 4                    THE WITNESS:  The lockup identification.

 5                    THE COURT:  Yes.  Did you put that in any

 6         report that you wrote before you wrote this Exhibit 1

 7         about the photo identification?

 8                    THE WITNESS:  I don't recall.

 9                    THE COURT:  Do you remember seeing Exhibit 2

10         that was prepared -- could somebody give him Exhibit 2,

11         please.

12                    THE WITNESS:  I have it, your Honor.

13                    THE COURT:  Okay.  You've got Exhibit 2?

14                    THE WITNESS:  Yes, your Honor.

15                    THE COURT:  What date did you prepare that?

16                    THE WITNESS:  October 29th, 2007.

17                    THE COURT:  And what caused you to prepare

18         it?

19                    THE WITNESS:  Um, Mr. Connolly had instructed

20         me to write this report.

21                    THE COURT:  And is this the report about

22         Mr. Santos identifying Mr. Ocasio in the lockup?

23                    THE WITNESS:  Yes, your Honor.

24                    THE COURT:  And did seeing the date of this

25         report cause you to understand that you didn't prepare
```

1    any report about the identification in the lockup prior

2    to October 29, 2007?

3              THE WITNESS:  That's correct.

4              THE COURT:  Did you understand that if

5    Mr. Santos had seen Mr. Ocasio in the lockup, that could

6    taint, injure -- meaning injure the reliability of the

7    identification he made concerning the photo array?

8              THE WITNESS:  I understand that now, your

9    Honor.

10             THE COURT:  Did you understand it in February

11   of 2007?  In March of 2007?

12             THE WITNESS:  Um, in March of 2007, I did.

13             THE COURT:  As of -- did Mr. Connolly tell you

14   that?

15             THE WITNESS:  Um, I believe he did.

16             THE COURT:  Well, he told you that it was

17   important to put in a report that Mr. -- well, let me

18   see if I can get the chronology.  Okay.  The --

19   Mr. Ocasio was identified by Mr. Santos to you in the

20   lockup around 9:45 in the morning.  Is that right?

21             THE WITNESS:  Yes.  February 22nd.

22             THE COURT:  And the photo identification

23   didn't occur until about what time in the afternoon?

24             THE WITNESS:  As it says on this report, on

25   Exhibit 1, your Honor, 1:25 p.m. on February 22nd.

1            THE COURT:  All right.  And between the

2    identification and the lockup and the conversation you

3    had with Mr. Santos and the presentation of the photo

4    array at about 1:30, did you have some conversation with

5    Mr. Connolly?

6            THE WITNESS:  I'm sure I did.

7            THE COURT:  And did you tell Mr. Connolly --

8    well, the fact that Mr. Santos was able to identify

9    Mr. Ocasio, was that important?

10            THE WITNESS:  Yes.

11            THE COURT:  And did you tell Mr. Connolly that

12    piece of information?

13            THE WITNESS:  I did.

14            THE COURT:  And did you tell him that before

15    you did -- and is that the time at which he told you to

16    put it in a report, that that's important?

17            THE WITNESS:  The time that I put -- the time

18    I told him about the incident.

19            THE COURT:  Well, what did he say to you when

20    you told him that Mr. Santos had identified Mr. Ocasio

21    after seeing him in the lockup?

22            THE WITNESS:  He expressed that that was an

23    important event and that I should document that.

24            THE COURT:  Did he tell you why?

25            THE WITNESS:  I don't recall him telling me

1    why, he just said that it was.

2              THE COURT:  Did you tell Mr. Connolly that you

3    were going to present a photo array to Mr. Santos?

4              THE WITNESS:  Um, I don't know the sequence of

5    events, but I, at one point during our conversation, I

6    told him that I was.

7              THE COURT:  Was that before you presented the

8    photo array?

9              THE WITNESS:  The conversation?  Oh, I told

10   him before I was going to show him -- I believe I did.

11   Um, I don't know if -- I don't know if it was that day

12   or days earlier.  I just don't recall.

13             THE COURT:  And why didn't you put the

14   important information about Mr. Santos seeing and

15   identifying Mr. Ocasio in the lockup in this report

16   prepared March 2, 2007, which is Exhibit 1?

17             THE WITNESS:  Why did it take me so long?

18             THE COURT:  No, why didn't you put that

19   information in this report?  Let me take a step back to

20   make sure you understand.

21        Exhibit 1 talks about the presentation of the

22   photo array, correct?

23             THE WITNESS:  It does.

24             THE COURT:  It doesn't say anything about the

25   identification in the lockup, isn't that correct?

1          THE WITNESS:  No, it does not.

2          THE COURT:  Why didn't you put anything about

3     the identification in the lockup, which you had been

4     told by Mr. Connolly was important and had to be

5     documented, in this report?

6          THE WITNESS:  Because that was a separate

7     event that occurred.  It just occurred at a different

8     time.  Um --

9          THE COURT:  Does the DEA have standard

10    procedures and/or practices as to how quickly DEA 6

11    reports are to be prepared?

12         THE WITNESS:  Yes.

13         THE COURT:  What is the DEA practice and

14    procedure required in February of 2007?

15         THE WITNESS:  My recollection from my training

16    in Quantico was that reports are to be prepared within 5

17    -- within 5 days to 7 days, depending on what type of

18    report it is.

19         THE COURT:  So is it correct for me to

20    understand that the report that's Exhibit 2, the one

21    dated October 29, 2007, should have been prepared no

22    later than 7 days after February 22nd, 2007?

23         THE WITNESS:  That would be accurate.

24         (Pause.)

25         THE COURT:  Why didn't you prepare that report

1    until October?

2            THE WITNESS:  I had forgotten.  I had other

3    duties that I was involved in and, um, I thought I had

4    prepared it.

5            THE COURT:  And what prompted -- I'm sorry?

6            THE WITNESS:  Um, I thought I had prepared it,

7    but in looking in the case file, it was clear that I had

8    not.

9            THE COURT:  And what prompted you to prepare

10   it in October?

11           THE WITNESS:  I had a conversation about

12   discovery issues that I had with the U.S. Attorney's

13   Office and I recalled, during that conversation, that I

14   hadn't created the file concerning the photo -- excuse

15   me, the lineup or rather the lockup -- the marshals'

16   lockup identification.

17           THE COURT:  Who did you speak to about that in

18   the U.S. Attorney's Office?

19           THE WITNESS:  I don't recall it -- if it was

20   Mr. Connolly.  I know we discussed discovery matters.

21   And based upon that conversation, I recall that

22   Mr. Connolly instructed me to write the report.

23           (Pause.)

24           THE COURT:  Have defense counsel revised their

25   view about not wanting to ask any questions?

1            MR. FICK:  No, your Honor.

2            MR. GARRITY:  No, your Honor.

3            THE COURT:  Mr. Fisher, are there more

4    questions you'd like to ask at this point?

5            MR. FISHER:  I have no further questions for

6    the witness, your Honor.

7            THE COURT:  All right.  Well, we're going to

8    take a recess.  Mr. Fisher, I'm ordering that you go

9    through your files during the recess.  If there are

10   reports between the dates of February 22nd and March

11   3rd, I want you to deliver them to my chambers.

12           MR. FISHER:  Your Honor, just to be clear.

13   Reports that were drafted between those dates or that

14   had to do with something that occurred between those

15   dates?

16           THE COURT:  I would say drafted between those

17   dates.  Well, actually, I would say both.

18           MR. FISHER:  Okay.

19           THE COURT:  I'm interested in that.  And if

20   you find anything else, written down or not written

21   down, including anything from Mr. Fay about the

22   identification procedure, I'd like to have that, too.

23   So I'm going to order that you ask one of your

24   colleagues to get you a sandwich and you look at this

25   and get it to me by about 2:00 and I'll see you all

1    again at 2:30.  Okay?  And at that point I'll decide

2    whether I can act on this matter orally or whether I

3    need to take it under advisement.  Okay?  Thank you.

4    The Court is it recess.

5         And, Mr. O'Shaughnessy, you'll have to come back,

6    when we come back at 2:30.  If I get some more

7    documents, I may have a few more questions.

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  Thank you.

10             (Lunch recess, 11:00 a.m.)

11             (Resumed, 2:30 p.m.)

12             THE COURT:  We have all counsel and

13   Mr. Ocasio.

14        About 25 minutes ago, I got a letter dated June 5,

15   2009, which will be docketed.  But, Mr. Fisher, would

16   you like to report on what you've done since we took the

17   break and what you've provided?

18             MR. FISHER:  Your Honor, what I did was I went

19   back up to my box of previously provided discovery and

20   the original, at least my copy of the original DEA 6s,

21   and other reports such as drug lab reports and other

22   things that Agent O'Shaughnessy may have reviewed and

23   signed and I went through those for the dates, February

24   22nd through March 3rd.  I also reviewed all the reports

25   to see if there were any, either signature dates or I

1   was really looking for the date prepared.  One thing

2   that since I -- about 3 or 4 minutes ago I was speaking

3   to Attorney Garrity and Attorney Fick and there's a

4   report which I looked at dated February 1st of '07, so

5   --

6           THE COURT:  Well, let me ask you this.  Have

7   you provided them what you provided me?

8           MR. FISHER:  Everything I provided except for

9   my letter.  I provided -- they have all the previous --

10  that was all Bates stamped for them, the previous --

11          THE COURT:  Well, I'll read the letter.  You

12  can't communicate with the Court without defense counsel

13  knowing you're communicating.

14          MR. FISHER:  Sure.  This report that was

15  brought to my attention by my brother, the last

16  paragraph, even though the date prepared was February

17  21st, '07, it mentioned Mr. Ocasio being transported

18  here on February 22nd.  So -- and the reason I missed

19  that is because I was looking at date prepared and the

20  date it was prepared was --

21          THE COURT:  That's fine.  Why don't you give

22  me a copy of it.

23          (Hands up.)

24          MR. FISHER:  And as I stated in my letter, I

25  didn't have the opportunity, also, after reviewing --

1            THE COURT:  Stop.  I want to read it.

2            MR. FISHER:  Oh, sure.

3            THE COURT:  (Reads.)  Which paragraph refers

4     to the 22nd?

5            MR. FISHER:  It's the last paragraph, your

6     Honor, on the last page.

7            THE COURT:  (Reads.)  All right.  Well, the

8     letter states:  "I have spoken with TFA Kevin Swift and

9     TFA James Fay.  They both reported to me that they

10    drafted no notes and submitted no reports.  TFA Swift

11    has almost no recollection of the identification that

12    occurred in the lockup.  TFA Fay had no exculpatory

13    information to report.  He stated that he has a limited

14    memory as to what occurred at the coffee shop

15    identification, but remembers that both cooperators were

16    sitting next to each other with two separate tables

17    approximately 3 feet apart.  He also remembers that each

18    cooperator had their own copy of the photo array."

19         Now, I've looked at the reports quickly.  I didn't

20    want to keep all of you waiting a long time.  Is there

21    anything inconsistent in these reports with the

22    testimony I heard today?

23            MR. FISHER:  None that I came across, your

24    Honor.  I read them again.  The reason I pulled them out

25    is because they fell into that pertinent time period.

```
 1              THE COURT:  All right.  And I note that Agent
 2    O'Shaughnessy prepared or signed a good number of
 3    reports after March 22nd and before -- in the next
 4    couple of weeks after that, and none of them included
 5    the important information, some of it helpful to the
 6    government, some of it very helpful to the defendant,
 7    about the encounter and identification in the lockup.
 8         Does the DEA have its own Inspector General or
 9    Office of Professional Responsibility or does it rely on
10    the Department of Justice Inspector General?  Do you
11    know?
12              MR. FISHER:  I do not personally know that.
13              THE COURT:  Well, let's bring
14    Mr. O'Shaughnessy in because I think it's fair and
15    appropriate that he hears what I have to say.  But I'll
16    ask him.
17              MR. FISHER:  Do you want him back on the
18    stand, your Honor?
19              THE COURT:  It's not necessary.
20              (Mr. O'Shaughnessy enters.)
21              THE COURT:  Mr. O'Shaughnessy, why don't you
22    come up here with Mr. Fisher, please.
23         Mr. O'Shaughnessy, do you know whether the Drug
24    Enforcement Administration has its own Inspector General
25    or Office of Professional Responsibility rather than
```

1   relying on the Department of Justice's?

2           THE WITNESS:  It does, your Honor.

3           THE COURT:  It does.  All right.  Well, is

4   there anything anybody would like to say before I orally

5   decide this request to dismiss the charges against

6   Mr. Ocasio?

7           MR. FICK:  No, your Honor.

8           THE COURT:  Well, since we broke for lunch, I

9   have received the information and additional documents

10  transmitted with Mr. Fisher's June 5, 2009 letter, which

11  will be filed.  Or actually I'll just make it the next

12  be, Exhibit 5.

13          (Exhibit 5, marked.)

14          THE COURT:  As I said before he came in, there

15  are a number of reports that Mr. O'Shaughnessy prepared

16  or signed shortly after February 22, 2007, none of them

17  include what he was told by the prosecutor then in

18  charge of the case was important information about the

19  encounter between Mr. Santos and Mr. Ocasio and the

20  identification by Mr. Santos of Mr. Ocasio in the

21  lockup.  Mr. Fisher reports that he had spoken to

22  Officer Fay who recalls that, for the photo ID, both

23  cooperators were sitting next to each other at two

24  separate tables approximately 3 feet apart.

25          The exculpatory evidence or the evidence helpful

1   to the defendant, the government had a duty -- including

2   for Mr. Fay, the government had a duty to provide,

3   before May 27th, 2009, when we conducted the scheduling

4   conference -- on May 27, I specifically ordered the

5   government to contact all participating agencies to

6   determine if there was exculpatory information,

7   including statements inconsistent with those

8   Mr. O'Shaughnessy had made.  The government did not do

9   that.  As I said earlier, a duty and then an order were

10  violated.  But I have limited time and resources to deal

11  with government errors or even misconduct.

12       This is not a case, I find, in which it would be

13  appropriate or really feasible to deny the requested --

14  to deny the request for leave to dismiss.  So I will

15  issue an order granting leave to dismiss the charges

16  against Mr. Ocasio.  The order will also require the

17  acting United States Attorney, Mr. Loucks, to read the

18  transcripts of May 27th and today and to certify to me

19  that he has done so.

20       This demonstrates to me, once again, that better

21  training of Assistant United States attorneys regarding

22  the **Brady** responsibilities and the local rules are

23  needed.  As I said repeatedly, had Mr. Fisher made

24  earnest and, in some respects, effective efforts to

25  disclose exculpatory information, however, those efforts

1    were inadequate and incomplete, which would not have

2    been the case if the local rules had been properly

3    understood and obeyed.

4        Local Rule 116.9 codifies the obligation of

5    participating agencies and law enforcement officers and

6    prosecutors to preserve their notes.  The purpose is, in

7    part, to assure that they can be reviewed for

8    exculpatory information and produced.  Local Rule 116.8

9    says what *Kyles* requires:  "The attorney for the

10   government shall inform all Federal, state and local

11   enforcement agencies formerly participating in the

12   criminal investigation that resulted in the case of the

13   discovery obligations set forth in these local rules and

14   obtain any information subject to disclosure from each

15   such agency."  As I explained earlier, the U.S.

16   Attorney's manual has the same direction.

17       However, here, all agencies involved in the

18   investigation, at least until the lunch break today,

19   have not been asked for exculpatory information.

20   Moreover, all notes had not been -- well, it hadn't been

21   determined whether there were notes that existed to be

22   reviewed for exculpatory information.  This case

23   involves yet another instance of a delayed disclosure of

24   important exculpatory information.

25       The failure to discern that information and

1   produce it earlier had severe potential consequences for

2   Mr. Ocasio and, I would infer, had some actual

3   consequences.  He's had a prosecution hanging over his

4   head and the threat of a long stretch in prison in a

5   case that when the government produced information, some

6   of which was due 42 days after the arraignment in 2007,

7   that if it had been produced in a timely manner, the

8   human anxiety of facing charges like these and a

9   potential long sentence would have been ended a long

10  time ago.

11      I'm also ordering the Acting United States

12  Attorney to provide my relevant orders in the May 27th

13  transcript and the transcript of today's proceedings to

14  the Special Agent in charge of the Drug Enforcement

15  Administration Office in Massachusetts and to the Drug

16  Enforcement Administration Inspector General.  That is

17  another matter that the Acting United States Attorney

18  will have to certify has been done.

19      I do not find that Mr. O'Shaughnessy deliberately

20  lied in his report or in his testimony today.  I am

21  skeptical about whether the two cooperated witnesses

22  were really 5 to 6 feet apart, as he testified, rather

23  than shoulder to shoulder, as I find that he told

24  Mr. Fisher before Mr. Fisher wrote that to Mr. Ocasio's

25  counsel.

1          However, at a minimum, the DEA 6 report that's

2     Exhibit 1 regarding the photo identification process is

3     misleading.  Mr. Fisher, the prosecutor, recognized this

4     and he disclosed it.  It's misleading in an important

5     way.  It's misleading in a way that might have made a

6     difference to the outcome of the motion to suppress.

7          The DEA 6 report that's Exhibit 2 was prepared 8

8     months after an important event, the encounter in the

9     lockup between Mr. Santos and Mr. Ocasio.  Mr. Santos's

10    identification of Mr. Ocasio in the lockup, which

11    occurred before the photo identification occurred, that,

12    as the government recognizes, is also material to the

13    issue of the admissibility of the photo identification

14    and the government properly recognized that, in the

15    circumstances, the photo identification was not reliable

16    and could not be used in evidence.  But even that

17    belatedly prepared DEA 6 was disclosed very late.  It

18    was disclosed 10 months after it was prepared, 18 months

19    after the event, about 16 months after the local rule

20    required the disclosure of material exculpatory

21    information relating to a foreseeable motion to

22    suppress.  At a minimum, those DEA 6 reports, Exhibits 1

23    and 2, reflect the failure of DEA to properly train and

24    supervise with regard to identification procedures and

25    writing reports.

1    However, dismissal is not appropriate under the

2    standard stated by the Supreme Court in ***Rinali vs.***

3    ***United States***, 434 U.S. 22 at 30, Note 15.  I find that

4    the dismissal has not been requested for the purpose of

5    harassing Mr. Ocasio.  The dismissal is with prejudice

6    with regard to the Federal government.  The Federal

7    government will not prosecute Mr. Ocasio for the events

8    relating to the charges against him in this case.  It's

9    been represented, I think reliably, that the State is

10   not likely to prosecute Mr. Ocasio.  Mr. Ocasio wants

11   the dismissal.

12       I also find that the motion to dismiss is not

13   prompted by considerations clearly contrast -- clearly

14   contrary to the public interest.  I find, more

15   specifically, that there are mixed motives for the

16   request for leave to dismiss.  In its present posture,

17   this case would be difficult for the government to prove

18   beyond a reasonable doubt.  The identification of

19   Mr. Ocasio, by two cooperating witnesses, Mr. and

20   Mrs. Santos, is inadmissible, as the government

21   recognizes.  Another witness against Mr. Ocasio is

22   co-defendant, Mr. Farias, who the government now

23   believes is not credible with regard to his, Farias's

24   evidence against Ocasio.  It's been represented to me

25   that other witnesses contradict Mr. Farias.

1        As far as I know, the principles of Federal

2   prosecution still provide that the Department of Justice

3   should not prosecute a case unless it believes the

4   admissible evidence is likely to be sufficient to prove

5   the charge beyond a reasonable doubt.  The prosecutor's

6   understanding of the evidence has evolved and it's

7   appropriate to actually encourage prosecutors, when they

8   view the evidence differently than they did at the time

9   the case is indicted, to consider further whether

10  prosecution meets that standard and if not to request

11  dismissal.  So, as I say, that's an appropriate and

12  indeed desirable course.

13       I also find that the request to dismiss was

14  motivated in part by a desire to keep possible

15  misconduct by a DEA agent from being explored and

16  perhaps exposed in court in the suppression hearing that

17  was scheduled for today.  If a cover up of government

18  misconduct were the sole motive for putting an alleged

19  drug dealer back on the street -- is what's happening

20  here, I would resist.

21       As I wrote most recently on May 18, 2009 in my

22  *Jones* decision:  "Criminal prosecution is not a game.

23  It's not -- the Federal court is not like the National

24  Basketball Association where sometimes the referees are

25  said to reason, 'Well, no harm, no foul.'"  I would not

1    want the dismissal of this case to abet the possible

2    misunderstanding that if there are serious errors or --

3    although I don't find, in this case, intentional

4    misconduct, but if there is intentional misconduct, if

5    it's revealed, the case can just be dropped and they'll

6    be no consequences for the human beings who represent

7    the government in that case.

8         However, the testimony I heard this morning has

9    developed certain facts.  The Department of Justice and

10   the Drug Enforcement Administration can consider whether

11   any further education for Mr. O'Shaughnessy or others,

12   regarding identification procedures and reports, is

13   necessary or appropriate.  The Department of Justice and

14   DEA can consider whether any discipline is necessary or

15   appropriate.

16        As I discussed in that May 18 **Jones** decision, my

17   experiences, painful, repeated experiences have caused

18   me, with regret, to become quite skeptical about the

19   capacity of the Department of Justice to deal

20   effectively with matters of serious errors or

21   intentionally misconduct.  However, as I also said in

22   the **Jones** decision, Attorney General Holder, who is now

23   a relatively new Attorney General, has expressed a

24   determination to improve the Department of Justice's

25   performance in these matters.  The Acting United States

1    Attorney, Mr. Loucks, has echoed that determination and

2    I believe, with many of his assistants, really does not

3    want these issues to recur.  These are matters primarily

4    for the Department of Justice to be able to, in a

5    renewed effort, to minimize the risk of their

6    recurrence, which is far too frequent.

7         So my order will require the United States

8    Attorney to order the transcript on an expedited basis.

9    I will give him until June 19 to read it, to certify to

10    me that he's read it, to certify to me that he's sent it

11    to the Drug Enforcement Administration's Special Agent

12    in charge of the Boston office and the Drug Enforcement

13    Administration's Inspector General.  I will provide it

14    to Judge Douglas Woodlock and Magistrate Judge Leo

15    Sorokin who will be organizing, or are organizing the

16    seminar for prosecutors, defense lawyers and judicial

17    officers that arises out of my *Jones* case.  I have

18    provided a schedule for the filings with regard to

19    Mr. Farias.  I'll wait for those filings and either

20    sentence Mr. Farias in August or deal with any motions

21    that are presented.

22         Is there anything further in this matter for

23    today?

24              MR. FISHER:  No, your Honor.

25              MR. FICK:  No, your Honor.

1          THE COURT:  The Court is in recess.

2              (Ends, 3:10 p.m.)

3

4              C E R T I F I C A T E

5

6     I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
    hereby certify that the foregoing record is a true and
7   accurate transcription of my stenographic notes, on Friday,
    June 5, 2009, before Chief Judge Mark L. Wolf, to the best
8   of my skill and ability.

9

10
    /s/ Richard H. Romanow
11  _____
    RICHARD H. ROMANOW
12

13

14

15

16

17

18

19

20

21

22

23

24

25